**Gloria J. BROWN, Plaintiff,**

v.

**BELLSOUTH TELECOMMUNICATIONS INC., Bellsouth Corporation, Bellsouth Pension Plan, and the Bellsouth Long Term Disability Plan, also known as the Bellsouth Long Term Disability Plan for Non–Salaried Employees, Defendants.**

No. 98–198–CIV–J–21A.

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 4, 1999.

George Frederick Schaefer, Law Office of George F. Schaefer, Gainesville, Dorothy Clay Sims, Sims & Lopez, P.A., Ocala, FL, for Gloria J. Brown, plaintiff.

Richard N. Margulies, McGuire, Woods, Battle & Boothe, LLP, Jacksonville, James R. Glenister, BellSouth Telecommunications, Inc., Atlanta, GA, for Bellsouth Telecommunications, Inc., Bellsouth Corporation, Bellsouth Pension Plan, Bellsouth Long Term Disability Plan aka Bellsouth Long Term Disability Plan for Non–Salaried employees, defendants.

## ORDER

NIMMONS, District Judge.

This cause comes before the Court on Defendant's Motion for Summary Judgment (Dkt.28), Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt.49), Plaintiff's Cross Motion for Summary Judgment (Dkt.37), and Defendants' Response in Opposition to Plaintiff's Cross Motion for Summary Judgment (Dkt.51).

## I. *Facts and Procedural History*

The Court accepts the following facts as true for the limited purpose of ruling on these motions for summary judgment. *See Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1500 (11th Cir.1985).

Plaintiff Gloria J. Brown ("Brown") was hired by BellSouth Telecommunications, Inc.'s ("BST") predecessor company, Southern Bell, on June 24, 1973, as an envelope "stuffer" and later transferred to directory assistance operator and toll operator positions. She remained an employee of BST/Southern Bell for over 20 years, i.e., until August 10, 1994.

BST is a subsidiary of defendant BellSouth Corporation ("BSC"). BST is a participating company in both BSC's long term disability ("LTD") plan for non-salaried employees and BSC's pension plan.

The Summary Plan Description of the LTD defines "disability" as follows:

> After participating in the Short Term Disability Plan for 52 weeks, you are considered disabled due to an illness or an injury, whether work-related or non-work-related, if:
>
> ●you are unable to work at any job other than one which pays less than half of your base pay at the time your short-term disability benefits began. Effective Jan. 1, 1993, earnings potential for purposes of this definition of disability will be determined using potential jobs in the community. (NOTE: No job openings need be available, the jobs need only to exist.)
>
> The earnings test takes into account your functional capacities, background (education, training, work experience), transferable skills, and your age. The geographic area searched for jobs (wages/salaries) will be within a 35–mile radius of your home address and/or within the prior work exchange.

BellSouth Long Term Disability Plan for Non–Salaried Employees, Summary Plan Description, Complaint (Dkt.1) Exh. D. at 3.

Under the BellSouth Pension Plan ("BSPP"), an employee who has completed 15 years or more of service and has become totally disabled as a result of sickness or injury is entitled to a disability pension upon leaving the service of the company due to the disability. BellSouth Pension Plan, Summary Plan Description, Complaint (Dkt.1), Exh. C at 1.

BSC is the Plan administrator[1] and sponsor of both the LTD and pension plans. Under both plans, a final claim review committee known as the Employees' Benefit Claim Review Committee ("EBCRC") is required to be appointed.

In the event of an employee appeal of the denial of benefits, the EBCRC is required to make a "full and fair review of the decision." BSC's and BST's Employees' Benefit Committees[2] administer and manage the day-to-day operations of the plans. Included within these management responsibilities are the right to grant and deny initial claims for benefits under the plans. According to the terms of the LTD plan:

> 10.5 *Named Fiduciaries.* BellSouth, as Plan Administrator, each Participating Company, each EBCRC and each EBC is a "named fiduciary" as that term is used in ERISA with respect to the particular duties and responsibilities herein provided . . .
>
> 10.6 *Final Authority.* The EBCRC (and its delegates) has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan. Such determinations and interpretations shall be final and conclusive.
>
> \* \* \* \* \* \*
>
> 11.3 *Source of Payments.* All Benefits authorized under the Plan shall be paid directly from the operating expenses accounts of the applicable Participating Company or from a trust established to the Company to fund a Voluntary Employees' Beneficiary Association (VEBA) under which such benefits are payable.
>
> To meet LTD obligations, the Participating Companies will make periodic contributions to the trust[.]

BellSouth Long Term Disability Plan for Non–Salaried Employees, Plaintiff's Exh. A (2480,2482). According to the terms of the BellSouth Pension Plan,

> All disability pensions . . . and related payments to annuitants shall be a

---

**1.** According to the Summary Plan Description of the BellSouth Pension Plan, the Plan administrator, i.e., BSC, has the authority to interpret the Plan's provisions and to exercise discretion in its interpretation and administration of the Plan. *See* Complaint, Dkt. 1, Exh. C at 19.

**2.** The Employees' Benefit Committee ("EBC") is appointed by the EBCRC to review initial claims for benefits and consists of "not less than three or more than seven persons who are not members of the EBCRC". *See* Bell-South LTD Plan for Non–Salaried Employees, § 10.2.

charge to the Pension Trust effective January 1, 1994.

BellSouth Pension Plan, Plaintiff's Exh. C at 2148. The LTD and the pension plans are employee benefit plans within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").

During 1990 and 1991, Brown suffered "seizures"[3] which resulted in her absence from work on numerous dates. In 1992, Brown consulted her general physician and was diagnosed as suffering from depression. Pursuant to her supervisor's suggestion, Brown sought treatment from a psychiatrist who prescribed an anti-depressant for her condition. Thereafter, Brown underwent a medical examination by the BST area medical director who found no apparent medical reason for the seizures. On May 1, 1992, Brown suffered another seizure at work and was taken by ambulance to the hospital.

Following months of continued depression and anxiety[4], Brown took short term disability leave from her job commencing in August 1993 and began receiving benefits under the BellSouth Short Term Disability Plan on August 12, 1993. Brown was approved for short term disability benefits based on the independent medical examination and report of a BST-referred psychiatrist, Eve A. Hershberger[5]. On August 30, 1993, Dr. Hershberger diagnosed Brown as suffering from severe depression and recommended that she be admitted to the Vista Pavilion ("Vista") facility[6] for evaluation of her mental stability. Dr. Hershberger found that Brown had neuro-vegetative signs of major depression and suicidal ideation. Her course of treatment for Brown included drug therapy, group counseling, and physical therapy.

Following Brown's discharge from Vista, Dr. Hershberger provided her with follow-up treatment and psychotherapy. While on short term disability leave, Brown saw Dr. Hershberger every week for an hour.

In December 1993, Brown underwent a Minnesota Multiphasic Inventory ("MMPI") psychological evaluation test. Patricia Barber, the licensed mental health counselor who evaluated the test results, summarized the test conclusions as follows:

> The results of the MMPI-2 suggest profile invalidity based on a "fake bad" presentation. In all likelihood, based on validity information, Mrs. Brown has presented herself in a falsely negative way. Therefore, the clinical scales cannot be interpreted with any certainty. There is a question raised regarding possible psychotic processes due to the material presented during the clinical interview and the fact that if the MMPI-2 had been valid, her highest elevation occurs on the 8 Scale. This is an area which may warrant further diagnostic exploration but unfortunately cannot be accurately concluded through the results of the MMPI-2.

Deposition of Brown, Dkt. 30, Def. Exh. 18.

On February 11, 1994, Dr. Randall Williams, who is board certified in psychiatry, performed a second independent medi-

---

3. The "seizures" were later determined to be anxiety or panic attacks. At her deposition, Brown testified that whenever she suffered a panic attack, she was unable to perform her job duties because she could not deal with customers, co-workers and managers. Brown testified that all she could think of during a panic attack was "getting out of the office to catch fresh air because [she] felt like [she was] losing consciousness." Deposition of Gloria Brown (Dkt. 30 at 51). During one of her panic attacks, she allegedly felt like everything was spinning around her and the walls were closing in on her.

4. Brown claims that her depression and anxiety developed at the operator job she held for 20 years. She asserts that customers had become more hostile and would yell at her and that she was no longer able to handle this type conduct.

5. Dr. Hershberger is a diplomate of the American Board of Psychiatry and Neurology.

6. Vista Pavilion is a branch of Alachua General Hospital. Brown was admitted to Vista for treatment on August 31, 1993, and discharged on September 7, 1993.

cal examination of Brown. In his report to BST, Dr. Williams *inter alia* stated:

> My impression is of a Major Depressive Disorder, DSMIII–R 296.32, and Generalized Anxiety Disorder, DSMIII–R 300.02. I do not feel that her anxiety attacks satisfy the criteria for panic disorder, but more information may add this to the diagnosis above At the present time she is receiving appropriate treatment this being individual psychotherapy and medication management. Her condition is chronic and may or may not be related to her employment situation. Clearly the idea of returning to her previous place of employment is objectionable to her and resolution of whether or not she will return to work should remove some stress from the current situation.

Deposition of Smiley, Dkt. 46, Exh. 1 at 1101.

On March 15, 1994, Dr. Hershberger notified Harriet Felkel, BellSouth's Assistant Staff Manager for Disability Benefits, that Brown had a "permanent total psychiatric disability." Dr. Hershberger noted that Brown continued to experience intrusive thoughts, increasing anxiety and crying episodes. In addition, Dr. Hershberger concluded that Brown had developed a "phobic aversion to exposure to her former workplace" and would be unable to return to work. Dr. Hershberger further stated:

> Originally it was felt that she might be able to return to work in a position that does not require interaction with customers, however in view of the phobic aversion, it is my opinion that this patient will not be able to return to work. In my experience, severe phobias often continue for many years in spite of appropriate psychotherapeutic desensitization. In Mrs. Brown's case, the picture is complicated by the ongoing depression and anxiety which has proved to be only partially responsive to psychotherapy and medication.

Deposition of Brown, Dkt. 30, Exh. 9.

By letter dated April 11, 1994, Felkel advised Brown that her short term disability benefits were being suspended effective immediately because the medical evidence submitted did "not support disability from doing any work including modified duties." *Id.*, Exh. 10. Felkel's letter informed Brown that if appropriate medical information were provided to substantiate her disability, it could result in the reinstatement of her benefits. Subsequently, BST retroactively reinstated Brown's short term disability benefits.

On April 25, 1994, Dr. Hershberger readmitted Brown to Vista because of worsening symptoms of depression and "recent development of suicidal ideations with active suicidal plans." The major stressor noted for Brown's readmission was the "demands that she return to work made by her supervisor even after her psychiatrist had declared the patient disabled from her job." Brown was discharged from Vista on May 3, 1994. On Brown's "Discharge Summary," Dr. Diaz, Brown's treating physician at Vista, noted the following:

> We met with the patient on a daily basis and indeed the primary thought content was that of distress over returning back to work, the pressure that she was put through at work, the difficulty adjusting to demands and how upset and mentally incapable she has felt as a consequence of distress and high demands she has been put through. Her affect was very despondent most of the time. She had initially some resistance to address her illness and to take positive steps to improving her illness. Nonetheless, at discharge she was more active in specific plans to improve her condition and addressing her own responsibility towards the improvement of her depression . . . .
> At this point I will recommend that patient not return to work since indeed this could precipitate and worsen her recovery and could precipitate a crisis of her depressive symptomatology . . . .

Deposition of Betty Smiley, Dkt. 46 at 1066–67. Brown's diagnosis at discharge was "[m]ajor depression, recurrent" and it was noted that she was not an "appropri-

ate candidate for return to work." *Id.* at 1067.

By letter dated April 27, 1994, BST notified Brown that her 52 weeks of short term disability benefits would be expiring on August 10, 1994. Brown was informed that she would then become eligible to apply for a disability pension and for long term disability benefits. Enclosed with the letter were the forms Brown needed to complete in order to apply for those benefits.

On May 19, 1994, Brown applied for disability pension benefits from the Bell-South pension plan and for long term disability benefits from the BellSouth Long Term Disability Plan. As required by Bell-South's long term disability policy, Brown also applied for Social Security disability benefits and was determined to be disabled within the meaning of the Social Security Act.

On June 9, 1994, Dr. Hershberger rendered an opinion that Brown was 100% disabled and certified that disability finding on a BST "Departmental Report of Sickness Disability" form. In relevant part, Dr. Hershberger's report states:

> Ms. Brown has been disabled since August 1993. Her condition has not improved to allow her to return to work. In my opinion she is 100% disabled. Prognosis is poor. I consider this permanent as I have seen no improvement that would allow this person to work. Ms. Brown suffers from depression accompanied by anxiety and panic attacks with recent suicidal plan requiring hospitalization. Given the persistent and recurrent nature of the exacerbation I do not recommend a return to work. I have seen no improvement that would indicate that the severity of the problem is anything but permanent.

*Id.* at 1056. Dr. Hershberger's opinion was based on her personal treatment of

Brown and on her discussions with Brown's treating physician at Vista, who had indicated to Dr. Hershberger that Brown would not be able to return to work.

On June 13, 1994, Brown contacted Dr. Hershberger's answering service. Psychologist Carl Butterfield, who had conducted counseling sessions with Brown in Dr. Hershberger's office, returned Brown's call. During their telephone conversation, Brown indicated she was suicidal and homicidal and informed Butterfield that she was planning to take her husband's rifle to her former workplace and shoot her supervisor and other Southern Bell employees. Later that day, Dr. Hershberger readmitted Brown to Vista. Dr. Hershberger, by letter[7] dated June 13, 1994, notified Felkel that Brown had been rehospitalized for "depression with suicidal plan." In addition, Dr. Hershberger noted that Brown continued to experience symptoms of intrusive thoughts, crying episodes and anxiety. Moreover, Dr. Hershberger opined that several of Brown's other symptoms had become more exacerbated including:

> Panic reaction associated with work stimuli
> a. Difficulty breathing, hyperventilation, shortness of breath
> b. Tremulousness and shaking
> Feelings of hopelessness and helplessness
> Increased suicidality
> Homicidality

*Id.* at 1081. Dr. Hershberger expressed the opinion that the degree of Brown's symptoms was "severe" and that her prognosis was "extremely poor". Dr. Hershberger requested assistance in transferring Brown from Vista to the Fear Clinic at the University of Florida for treatment. *Id.* In conclusion, Dr. Hershberger states the following in her letter:

---

7. An Interoffice Memorandum dated June 20, 1994, from Dr. Barry Kern, BST's in-house medical director, to Felkel points out that Dr. Hershberger's June 13, 1994, letter indicated that Brown had "significant phobia regarding work at Southern Bell." *Id.* at 1080. Dr. Kern further noted that, in his opinion, Brown was "most likely disabled from May 11–June 10 time frame as well." *Id.*

Since you have determined that my opinion of permanent total psychiatric disability is invalid and since you have informed me that you intend to take this patient off of disability, I cannot be responsible for the outcome of this decision.

*Id.*

In the "Discharge Summary," regarding Brown's hospitalization at Vista from June 14, through June 23, 1994, Dr. Diaz, Brown's treating physician at the hospital, noted that:

The patient has been extremely upset and dysphoric about demands placed about her returning to work. Her fears of unable to perform, her inability to control her depression, the anxiety and phobic symptoms about going back to work have come back.... She has had poor impulse control, her sleep has been worse, has become very tearful and indeed symptoms of anxiety have exacerbated when she thinks about going to work, expectations placed on herself as a worker, the demands in performing the good job that she has done over the course of the years. She becomes extremely concerned and anxious, agitated since she finds herself unable to do as well as she has done for the last 20 years. These concerns, fears, and depressive symptomatology have worsened her depression, have caused suicidal and even homicidal ideation and indeed precipitating her readmission.

\* \* \* \* \* \*

On the 23rd, the patient requested to be released; she did not express any suicidal ideations or thoughts. She was much more positive on a one to one about herself, about her role in her recovery; indeed there was still episodes of anxiety, but these periods were becoming less predominant. This is an area that will still need to be worked on as part of

patient's ongoing therapy. At this point, I still feel that pressuring the patient to return to work will not be in the patient's best advantage and it will be self-defeating and will not stimulate the patient's improvement. I do agree that the patient should be able to not be forced to return to a job that has been causing increased stress and increased malfunctioning.

*Id.* at 1057–58.

Thereafter, Felkel contacted Brown's supervisor, Rebecca Leynes, and expressed concern that referring Brown to the Fear Clinic might be viewed as an admission of liability by BST that the job was causing Brown to experience psychiatric problems. During that telephone conversation Leynes advised Felkel that Gainesville's BST office had no jobs that Brown could fill if a restriction of "no customer contact" were placed on her. Instead of referring Brown to the Fear Clinic, Felkel indicated that she intended to line up another independent medical examination in support of the company's position that Brown was not disabled.

BST thereafter scheduled and paid for psychiatrist Dr. Jay Gold to conduct a third independent medical examination of Brown and for testing by Dr. Gold's licensed mental health counselor, Patricia Barber. On July 12, 1994, Brown met with Barber. Following a fifty minute clinical interview during which Brown disclosed to Barber that she was on medications, had a reading impairment and was unable to retain written information, Barber administered the Minnesota Multiphasic Personality Inventory test in its revised form ("MMPI–2"). Brown failed to answer 27 of the 567 questions on the test. In the "Summary & Conclusion" portion of the psychological evaluation report prepared by Barber for BST, she *inter alia* states [8]:

---

**8.** At her deposition taken on March 3, 1999, Barber acknowledged that Brown's MMPI–2 was invalid and could not be relied upon for conclusions regarding Brown's psychological condition or whether Brown could or could

not work based on her psychological condition. Deposition of Barber, Dkt. 45 at 52, 54. In addition, Barber acknowledged that there were numerous factors that could account for Brown's test result and that such a result did

The results of the MMPI–2 suggest profile invalidity based on a "fake bad" presentation. In all likelihood, based on validity information, Mrs. Brown has presented herself in a falsely negative way. Therefore, the clinical scales cannot be interpreted with any certainty. . . .

Deposition of Brown, Dkt. 30, Def. Exh. 18.

Thereafter, Brown went to Dr. Gold's office on July 27, 1994, where she underwent a one hour and fifteen minute independent medical exam. Following his examination of Brown, Dr. Gold prepared a report for BST in which he made the following assessments and recommendations:

In my medical opinion, Mrs. Brown suffers from a Major Depression, recurrent in early remission. She also has a high degree of anxiety which I believe to be episodic and situationally engendered. I do not believe she is psychotic nor does she meet criteria for Panic Disorder. It is my contention that this woman has a Mixed Personality Disorder with passive/aggressive, passive/dependent, and histrionic traits. I believe under chronic stress she has the potential to decompensate sooner than others as she doesn't have the psychological resources to draw upon.

Her psychiatric condition is not due to BellSouth but work stress can precipitate coping difficulties. I believe Mrs. Brown has a distaste for returning to work as evidenced by two psychological testing reports showing "fake-bad" profiles. It is my suggestion that Mrs. Brown be removed from the operator's position and given another job title. She does not meet criteria for permanent psychiatric disability. This is a woman who needs defined treatment goals in psychotherapy rather than "supportive psychotherapy" which can

go on for years with little change in coping patterns, i.e., reactive rather than pro-active. . . . .

Deposition of Brown, Dkt. 30, Def. Exh.20.

By letter dated August 9, 1994, Brown's supervisor Leynes notified Brown that her last day on BST's active payroll was August 10, 1994. On August 25, 1994, the Director of Health and Benefits Services, in a memorandum to the Director of Employee Relations, indicated that based on the latest medical information on Brown, it had been determined that Brown had a permanent medical restrictions of "No Customer Contact" and that her department could not accommodate that restriction. *Id.*, Def. Exh. 22.

Thereafter, on September 19, 1994, the Director of Health and Benefits Services ("Director") denied Brown's LTD eligibility and benefits effective August 11, 1994, because she was not considered totally disabled nor disabled from earning 50% of her monthly income at the time her short term disability benefits ended. In support of the decision, the Director noted that Dr. Gold's independent medical evaluation had indicated that Brown was able to return to work with the restriction of "no customer contact."

In addition, the Director denied Brown's request for disability pension effective August 11, 1994, because she was not considered totally disabled for all work. In support thereof, the Director cited to Dr. Gold's independent medical examination and his determination that Brown could return to work with the restriction of "no customer contact."

Brown timely appealed the denial of her request for benefits to the Employee Benefit Claim Review Committee ("EBCRC"). On December 13, 1994, Brown submitted to the EBCRC the psychological evaluation prepared by the University of Florida

---

not mean that Brown did not suffer from major depression. *Id.* at 39.

In addition, Dr. Rodney A. Poetter, a licensed clinical psychologist reviewed Barber's report and opined that based on his own

expertise in administering and interpreting MMPIs, it was not justifiable for Barber to conclude that Brown was "faking bad." Affidavit of Rodney A. Poetter, Ph.D. (Dkt.39).

Fear Clinic. That psychological evaluation report indicated that the following "procedures" had been administered to Brown:

Anxiety Disorders Interview Schedule–Revised (ADIS–R)

Life History Questionnaire

Beck Depression Inventory (BDI)

Fear Survey Schedule (FSS–III)

Marks and Mathews Fear Questionnaire (MMFQ)

Revised Physical Anhedonia Scale (RPA)

Social Avoidance and Distress Scale (SADS)

Zuckerman Sensation Seeking Scale (SSS–V)

Deposition of Betty Smiley, Dkt. 46 at 1046. The report states the following under "Test Results and Interpretation":

Consistent with information obtained in the interview, Ms. Brown's responses on the FSS–III indicate that she is extremely fearful of numerous situations (score = 383, greater than two standard deviations above the mean for the FADC [Fear and Anxiety Disorders Clinic] sample). Her BDI score (36) indicates severe depression. Ms. Brown's responses on the MMFQ indicate levels of agoraphobic avoidance, social avoidance, and anxiety comparable to those of a sample of FADC patients. Ms. Brown's RPA score, indicative of anhedonia, and her SADS score, indicative of social avoidance and distress, are also comparable to this same sample of FADC patients. Her SSS–V score indicates average optimal levels of stimulation and arousal in comparison with a normal nonclinical sample.

*Id.* at 1048–49. The report contains the following "Diagnostic Impression" of Brown:

300.21 Panic Disorder with Agoraphobia

296.23 Major Depressive Disorder, Single Episode, Severe

300.29 Specific Phobia, Multiple Types

*Id.* at 1049. On a scale of ranging from "0" to "7," the report rates the "Severity of [Brown's] Primary Diagnostic Condition" as a "6" with the following commentary in support thereof:

Ms. Brown experiences panic attacks and persistent fear of future attacks. She limits her actions to avoid numerous situations associated with attacks [i.e., driving, crowds, grocery stores, and public places]. She also perceives other situations to be dangerous in their own right [i.e., heights, air travel, certain animals, blood and injury to herself and others, driving and bodies of water]. She attributes her recent job loss to the disruption these problems have caused her. Ms. Brown also reports experiencing a severely depressed mood, and she is very distressed by her condition.

*Id.* at 1049–50. The report concludes with the following "Global Assessment of Functioning":

Ms. Brown is not functioning well at this time. Her problems with anxiety and depression restrict her sphere of activities to the point that she finds it difficult to meet the responsibilities of either a job or her family. She is not participating in her usual activities.

*Id.* at 1050.

On March 2, 1995, the EBCRC met and reviewed Brown's case. By letter dated March 8, 1995, Brown received notification that:

After careful consideration of all facts, the EBCRC sustained the Director's decision to deny Long Term Disability eligibility and benefits beginning August 11, 1994 because you are capable of performing the requirements of a job where you could earn 50% of your monthly income at the time of termination from the Company.

Deposition of Brown, Dkt. 30, Defendant's Exh. 32.

On March 5, 1998, Brown filed this action [9] alleging denial of disability pension

---

9. Brown's Complaint contained claims under the Americans with Disabilities Act (Count I) and the Florida Civil Rights Act of 1992 (Count II). By stipulation of the parties, *see* Dkt. 26, those claims were dismissed.

benefits, long-term disability benefits, and unlawful retaliation under ERISA. Defendants filed an Answer and Counterclaim. The Counterclaim asserts that in October 1994, Brown was inadvertently added to the pension payroll system and disability pension benefits in the amount of $499.89 and LTD benefits in the amount of $553.82 were paid to her in error. Defendants request a declaration that Brown is obligated to reimburse them in the amount of $1,053.71, plus interest; a declaration that Brown has wrongfully and improperly retained the sum of money paid erroneously under the plans; and restitution under ERISA in the amount $1053.71, together with interest, costs and attorneys fees on the grounds that Brown's retention of the erroneously paid sum constitutes conversion and unjust enrichment.

## II. *Summary Judgment Standard*

Summary judgment is appropriate only when a court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In making this determination, a court must view all of the evidence in a light most favorable to the non-moving party. *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The burden of establishing the absence of a genuine issue is on the moving party. *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the burden extends only to facts that might affect the outcome of the suit under the governing law. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once this burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. However, a plaintiff need only present evidence from which a jury might re-

turn a verdict in his favor in order to survive a summary judgment motion. *Samples on Behalf of Samples,* 846 F.2d at 1330.

## III. *Standard of Review for Denial of ERISA Benefits*

■■■ Title 29 U.S.C. § 1132(a)(1)(B) governs actions challenging the denial of ERISA benefits. That statutory section, however, does not establish a standard of judicial review. The Supreme Court, in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80,92 (1989), noted that courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans." (quoting *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). The Supreme Court went on to hold that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956, 103 L.Ed.2d at 95. The Supreme Court qualified this holding by stating that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] is determining whether there is an abuse of discretion.'" *Id.* (quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

■■■ The Eleventh Circuit has interpreted *Firestone* to mandate an arbitrary and capricious standard of review—often used interchangeably with an abuse of discretion standard—if the plan administrator or fiduciary has discretionary authority to make eligibility determinations or to construe disputed terms of the plan. *Hunt v. Hawthorne Associates, Inc.,* 119 F.3d 888, 912 (11th Cir.1997); *see also Jett v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989). The language conferring discretion on the administrator

or fiduciary must be "express language unambiguous in its design" in order to trigger the arbitrary and capricious standard of review. *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir.1994). The Court should apply a heightened arbitrary and capricious standard, however, if the plan administrator or fiduciary suffers from a conflict of interest in rendering its determination. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956, 103 L.Ed.2d at 95. The Eleventh Circuit has noted that when an insurance company is both the ERISA plan fiduciary and the insurance company responsible for paying the claims, a strong conflict of interest exists making application of the heightened arbitrary and capricious standard appropriate. *See Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1562 (11th Cir.1990).

The Eleventh Circuit in *Brown* noted that:

> [A] fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished.

*Id.* at 1568.

> It is fundamental that the fiduciary's interpretation first must be "wrong" from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.

*Id.* at 1566, n. 12.

> [A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*Id.* at 1566–67.

> The fiduciary, however, should bear the burden of dispelling the notion that its conflict of interest has tainted its judgment. If the fiduciary carries this burden, the party challenging its action may

still succeed if the action is arbitrary and capricious by other measures.

*Id.* at 1568.

■ Thus, if a heightened arbitrary and capricious standard applies, the Court must first conduct a de novo review to determine whether the plan administrator or fiduciary's determination was legally correct. If the plan administrator or fiduciary's determination is deemed "wrong," the plan beneficiary must then demonstrate a substantial conflict of interest on the part of the plan administrator or fiduciary responsible for benefits determinations. After such a showing is made, the burden shifts to the plan administrator or fiduciary to prove that the interpretation of plan provisions committed to its discretion was not tainted by self-interest. *Id.* at 1566.

## IV. *Defendants' Motion for Summary Judgment*

### A. Defendants' Position

Defendants contend that the EBCRC's decision to uphold the denial of benefits to Brown is subject to the less stringent "arbitrary and capricious" standard of review and point out that both the LTD and BSPP contain express language conferring "discretionary authority" to the EBCRC to interpret and administer the plans' provisions. In support of their contention, Defendants cite to the following language from the LTD Summary Plan Description:

> Each EBCRC, for the participating companies it serves, has been delegated exclusive, discretionary authority to finally and conclusively interpret and administer the provisions of the plan. The EBCRC's decisions are final and are not subject to further administrative review.

Smiley Affidavit, Dkt. 33, Exh. 2 at 7. In addition, Defendants cite to the following language from the BSPP Summary Plan:

> The [EBCRC] determines conclusively for all parties all questions arising in the administration of the Plan, and any deci-

sion of this Committee is final and not subject to further review.

*Id.,* Exh. 1 at 19. Defendants contend that the EBCRC's decision was not arbitrary and capricious as the records available on the date of the final appeal decision, March 2, 1995, failed to indicate that Brown was disabled within the meaning of that term under either plan. Defendants claim that the quality of Dr. Hershberger's opinion that Brown was disabled was less reliable than Dr. Gold's opinion. According to Defendants, Dr. Hershberger relied solely on Brown's subjective symptoms without any objective medical data to support them. In the converse, Defendants assert that Dr. Gold's report contained objective observations regarding, *inter alia,* her manner, speech, memory, and ability to converse.

Defendants then point out that Brown was not disabled under the terms of the LTD plan because, based on Dr. Gold's report that she could work in a position without customer contact, Brown could have worked in a clerical position earning 50% of her operator position base pay of $510 per week. With regard to the pension benefits eligibility, Defendants claim that Brown was not totally disabled from all work as required under the terms of the BSPP as she was capable of holding a clerical position. In support of their contention, Defendants note that "Brown admitted that she was engaged in public speaking (i.e., sermons), attended board meetings at her church, and was attending college classes and taking tests." Defendants' Motion for Summary Judgment, Dkt. 28 at 17.

With regard to Brown's retaliatory discharge claim, Defendants assert that Brown's claim fails because she did not exhaust her administrative remedies (i.e., she did not seek review of her termination under either plan) and has presented no evidence that BST terminated her employment because she sought benefits. According to Defendants, the undisputed evidence demonstrates that BST had a legitimate business reason for its action, i.e., Brown was administratively removed from

BST's payroll because she did not return to work following expiration of her short term disability benefits. Moreover, Defendants assert that Brown's unsubstantiated assertion that she was terminated because she filed applications for benefits is insufficient to survive summary judgment.

Finally, Defendants contend that the undisputed evidence shows that due to a clerical and computer error, Brown received and retained $1,053.71 in erroneous payments under the benefits plans. If the Court grants summary judgment to Defendants on Brown's claims for benefits, Defendants assert that they would be entitled to summary judgment on their counterclaim for recovery of the inappropriately paid benefits.

**B. Brown's Response**

Brown asserts that the appropriate standard of judicial review in this case is the "heightened arbitrary and capricious" standard. In support of her position, she states:

The defendants operated under conflict of interest for the following reasons. The long-term disability benefits were paid out of the operating expenses of defendant BST. Although all of the disability pension benefits were paid out of a trust fund, the parent corporation, defendant BellSouth Corporation, was solely responsible for the contributions to this trust fund on behalf of BST employees. The E.B.C.R.C. committee members were all high-level BST management employees with business backgrounds and no medical background or experience. Likewise, the defendants' Director of Health and Benefits, Betty Smiley, was a BST employee who candidly acknowledges that defendant BellSouth Corporation, the holding company of BST, is viewed by her as her employer. (Smiley depo at 5). The secretary and committee members were also stockholders in defendant BellSouth Corporation at the time they adminis-

tered its plan. Direct evidence of a conflict of interest is Ms. Harriet Felkel's tape recorded statement complaining that she had to spend "company money" on two additional independent medical examinations of the plaintiff. [Transcripts of Tape Recorded Telephone Conversations, Dkt. 47 at 230–231].

Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Dkt. 49 at 16–17.

Brown contends that Defendants wrongfully determined that the available medical evidence support the denial of her benefits. Brown points out that extensive medical records from her treating physicians, i.e., Dr. Hershberger, Dr. Diaz, document the severity of her depression, anxiety, panic disorder, and suicidal and homicidal ideation. However, Defendants support their denial of benefits determination by relying on the one hour clinical interview conducted by Dr. Gold and the flawed MMPI test administered by Patricia Barber. Moreover, Brown claims that Defendants failed to review the actual medical records and instead relied on a non-medically trained clerical employee's "brief" summarizing the medical evidence. Furthermore, Brown contends that the EBCRC failed to abide by its own rules and by-laws, i.e., it failed to review the supporting information submitted by Brown, and it failed to keep a record of the proceedings at which Brown's case was considered. Finally, Brown contends that there is evidence that Defendants engaged in bad faith conduct by seeking a third independent medical examination that would support their position, i.e. that Brown had to be fired because her "no customer contact" restriction could not be accommodated at the Gainesville branch.

With regard to her ability to work, Brown asserts that Defendants mischaracterized her deposition testimony and that their claim that she could perform typical clerical duties earning more than 50% of her operator position pay is unsubstantiated speculation.

Brown then contends that Defendants' definition of total disability ("the inability to perform any work activities, including part-time clerical duties, such as filing, working on computers, answering telephones, etc.") is arbitrary and capricious. Brown claims that the term should not be interpreted to mean absolute helplessness but rather it should be defined as "unable to perform all the substantial and material acts necessary to the prosecution of some gainful business or occupation." *Id.,* Dkt. 49 at 22.

With regard to Defendants' claim that Brown is precluded from bringing her ERISA § 510 (retaliatory discharge) claim due to her failure to exhaust her administrative remedies, Brown contends that Defendants cannot make this argument since they failed to raise it as an affirmative defense in their answer to the complaint. Moreover, Brown asserts that there is no requirement of administrative exhaustion of an ERISA § 510 claim within the summary plan descriptions for the two subject plans. Even if such an administrative exhaustion requirement existed, Brown points out that exhaustion would be futile in this case as it was employees of the Defendants' benefits office in Atlanta who "masterminded the retaliatory discharge scheme" and it would have been useless to have them review their own misconduct.

## V. Brown's Cross Motion for Summary Judgment

### A. Brown's Position

Brown asserts that she is entitled to summary judgment on her claims for denial of disability pension benefits, long-term disability benefits, and unlawful retaliation under ERISA. In addition, Brown contends that she is entitled to summary judgment on the Defendants' counterclaim and is entitled to an award of attorney's fees and costs.

Brown claims that the heightened arbitrary and capricious standard of review applies because the parent corporation, BSC, was solely responsible for the contri-

butions made (on behalf of BST employees) to the trust fund from which the disability pension benefits were paid and because the LTD benefits were paid directly from BST's operating expenses. Brown, in attachment 2 to her Cross–Motion, summarizes the medical evidence which she claims overwhelmingly shows that she was permanently disabled at the time the EBCRC reviewed her case. She notes that after Dr. Hershberger—who was the physician Defendants referred her to in the first place—concluded that she was totally disabled, they "shopped" for other psychiatrists who would support Defendants' decision to deny the benefits claims.

Even under the non-heightened arbitrary and capricious standard of review, Brown contends she is entitled to prevail because the EBCRC's interpretation of the plan was not made rationally and in good faith as based on selective review of medical evidence and on an incomplete brief prepared by a clerical employee. Brown points out that it is incomprehensible how the EBCRC could intelligently and fairly consider all the complicated medical evidence in her case—as well as that in the five other cases reviewed—during a meeting that lasted two hours or less.

As inferences of bad faith on the part of the Defendants in denying her claims for benefits, Brown cites to the following facts: (1) that the Defendants "repeatedly shopped for the predetermined [medical] opinion that they wanted; (2) that they viewed Brown's homicidal tendencies serious enough to warrant a security investigation of her; (3) that her claims for bene-fits were treated differently than another employee's, "John Doe," who also suffered from major depression with suicidal ideation and was found to be disabled under the BPP and LTD plans even after Dr. Doleys[10] recommended a denial of his claims for benefits; (4) that the EBCRC failed to follow its own rules and by-laws, i.e., failed to look at all the supporting information submitted by Brown; (5) that the Defendants failed to comply with federal regulations regarding the EBCRC's review procedures, i.e., failed to allow Brown's attorney to review the "brief"—the only document actually presented to the EBCRC; and (6) that Defendants failed to state in their denial decision the specific reasons (i.e., clinical information) for the denial."

With respect to her claim under § 510 of ERISA, 29 U.S.C. § 1140[11], Brown asserts that the record evidence, i.e., transcripts of recorded telephone conversations between Brown's supervisor and other labor managers, demonstrate that Defendants violated the statute by arranging to obtain a "third" and "better" independent medical evaluation "which would have a no customer contact recommendation so that [she] could be terminated since there would [be] no alternative jobs and at the same time be deemed not disabled." Plaintiff's Cross–Motion for Summary Judgment, Dkt. 37 at 42.

Finally, with respect to the request for attorney's fees and costs, Brown concedes that there is no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action. However, Brown contends that under the factors[12]

---

10. BST has a contract with Daniel Doleys, Ph.D., to review claims and provide assistance to BST administration staff.

11. That statutory section provides, in relevant part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . ."

12. In deciding a motion for attorney's fees under ERISA, the Court is to consider (al-though not required to discuss each of) the following factors:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy any award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

enumerated by the Eleventh Circuit in *Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476. 1485 (11th Cir.1995), she should be entitled to award of attorney's fees and costs because there exists evidence of bad faith and culpability on the Defendants' part; Defendant's financial statements reflect their ability to afford such an award; and an award of fees and costs is necessary to deter Defendants from acting arbitrarily and capriciously in the future.

## B. Defendants' Response

Defendants claim that Brown's Cross-Motion for Summary Judgment relies on inadmissable speculation and unsupported theory that the actual evidence in the record fails to support her claims. Moreover, Defendants assert that Brown's inclusion of her retaliation claim in her Motion for Summary Judgment demonstrates that the Cross-Motion was filed for the improper purpose of distracting and confusing the issues in Defendants' Motion for Summary Judgment. According to Defendants,

> [t]he undisputed evidence demonstrates that Brown was administratively removed from the payroll because her STD benefits had expired and she did not return to work. Such administrative action was taken pursuant to Company policy which applies to *all* employees.

Defendants' Response, Dkt. 51 at 5. Defendants claim that Brown has failed to set forth any evidence rebutting this legitimate business reason for their actions.

Defendants further note that Brown has furnished no evidence that would support the inference that Dr. Gold was biased or motivated to render a predetermined opinion. Moreover, Defendants assert that Brown has failed to introduce evidence substantiating her claim that she was discharged for exercising any right under an employee benefit plan. According to Defendants, Brown was simply removed from the active payroll on account of the fact

(5) the relative merits of the parties' positions.

that her 52 weeks of STD benefits had been exhausted and she had not returned to work.

Defendants then claim that Brown has failed to demonstrate a substantial conflict of interest on the part of BSC such that the heightened standard of review would be warranted. Defendants point out that since the disability pension is paid from the assets of a trust funded by BSC, an award of benefits under that plan would have no impact on BST's operating expenses. Moreover, since the funds were already committed to that trust, an award to Brown would have not depleted the assets of either BST or BSC.

Regardless of the standard of review applied, Defendants assert that their decision to deny Brown's claims was properly based on the objective observations contained in Dr. Gold's report rather than the subjective reports of symptoms (without supporting clinical data) contained in Dr. Hershberger's reports.

With regard to Brown's claim for attorney's fees and costs, Defendants claims that she has failed to demonstrate, as a matter of law, her entitlement to those fees under the factors cited in *Florence Nightingale Nursing Service, Inc. v. Blue Cross.*

## VI. *Discussion*

 Having conducted a de novo review of the medical evidence submitted to the EBCRC in support of Brown's claims for benefits under the LTD and BSPP plans, the Court finds that the plan administrator's denial was not legally correct. The overwhelming record evidence reflects that Brown suffers from chronic major depression and anxiety which is precipitated by work-related stresses and situations. The opinions of Brown's primary treating physicians, both her outpatient (Dr. Hershberger) and inpatient (Dr. Diaz) psychiatrists, should have been given greater weight

41 F.3d at 1485 (citing *Freeman v. Continental Ins. Co.,* 996 F.2d 1116, 1119 (11th Cir. 1993).)

than that given Dr. Gold who only examined Brown once for approximately one hour and fifteen minutes and who relied on the less-than-reliable testing conducted by his mental health counselor, Patricia Barber. Brown satisfies the LTD plan's definition of disability in that after participating in the Short Term Disability Plan for 52 weeks, she is unable to work at any job (which pays less than half of her base pay at the time her STD benefits began) due to the severity of her depression and anxiety and particularly due to the fact that the work-related environment acts as the "trigger" for the onset of her illness. Brown satisfies the disability requirements under the BSPP as she is an employee who has completed 15 years or more of service and has become totally disabled as a result of sickness.

■ Having determined that the EBCRC's denial decision was wrong from the perspective of de novo review, the Court looks to the question of whether BST, the plan administrator or fiduciary, suffers a conflict of interest. Here, it appears that the heightened arbitrary and capricious standard applies as the LTD benefits were paid out of BST's operating expenses and thus any award of LTD benefits to Brown would have had a direct affect on BST's operating funds. Likewise, even though the BSPP benefits are paid out of a trust fund, all funds contributed to that trust belonged to BST's parent corporation, BellSouth Corporation, and it appears likely that BST would feel duty bound to conserve its corporate parents' funds.

■ Having determined that Brown has adequately demonstrated that a substantial conflict of interest existed on the part of BST in its benefits denial decision, the Court looks to see if BST, as plan administrator or fiduciary, dispelled the notion that its conflict of interest tainted its judgment. The Court does not find that BST has met its burden. Nothing in BST's submissions satisfactorily explains why the treating physicians reports were given such little weight in the benefits'

determination. Moreover, the Court—having expended many hours reviewing the medical reports and other documentation submitted herewith—is convinced that the EBCRC could not possibly have given Brown's claims for benefits adequate consideration given the extremely brief amount of time the committee took in making its decision. Accordingly, with respect to the claims for LTD and disability pension benefits, the Court will grant Brown's Cross–Motion for Summary Judgment and will deny Defendants' Motion for Summary Judgment. In light of this determination, the Court will also deny the Defendants' Motion for Summary Judgment as to their counterclaim for the $1,053.71 benefits payment allegedly made to Brown in error.

■ With respect to Brown's claim that Defendants violated 29 U.S.C. § 1140 by discharging her from employment for exercising rights to which she was entitled under the provisions of employee benefit plans, although they give different "interpretations" to the circumstances surrounding Brown's discharge from employment, the parties concede that no genuine issues of material fact exist with regard to Brown's discharge. Having reviewed the relevant record evidence, the Court agrees with Defendants that Brown has failed to demonstrate that they discharged, disciplined, or discriminated against her for applying for benefits under the LTD or disability pension plans. Moreover, Brown has failed to show that Defendants discharged her "for the purpose of interfering with the attainment of any right" she may have been eligible for under the subject employee benefit plans. The fact that Defendants removed Brown from the active payroll following the expiration of her 52–weeks of short term disability benefits did not preclude her from continuing to pursue her claims for benefits under the LTD or disability benefits plans. Accordingly, with respect to the unlawful retaliation claim, the Court will deny Brown's Cross–Motion for Summary Judgment and will grant Defendants' Motion for Summary Judgment.

Finally, the Court has considered the five factors set forth in *Florence Nightingale Nursing Service, Inc. v. Blue Cross/ Blue Shield of Alabama*, 41 F.3d 1476 (11th Cir.1995), and finds that, based on the relative merits of the parties' positions, Defendants' ability to satisfy an award of attorney's fees, and the fact that an award of attorney's fees may in the future deter Defendants from denying meritorious claims for benefits under their LTD and disability pension plans, the Court will grant Brown's request for attorney's fees and costs.

Accordingly, it is hereby **ORDERED**:

1. Defendants' Motion for Summary Judgment (Dkt.28) is **DENIED with respect to the Plaintiff's claims for long term disability; disability pension benefits; and attorneys' fees and costs**; and, furthermore, is **DENIED with respect to the Defendants' counterclaim for $1,053.71.** The Defendants' Motion for Summary Judgment (Dkt.28) is **GRANTED with respect to the unlawful retaliation claim.**

2. Plaintiff's Cross Motion for Summary Judgment (Dkt.37) is **GRANTED with respect to the claims for long term disability; disability pension benefits; and attorneys' fees and costs.** The Plaintiff's Cross Motion for Summary Judgment (Dkt.37) is **DENIED with respect to the unlawful retaliation claim.**

3. The Clerk is **directed** to enter judgment in accordance with the foregoing.

4. Plaintiff is **directed** to file with the Court, **on or before August 27, 1999,** a memorandum setting forth the amount of attorney's fees and costs sought along with supporting documentation. Defendants' response thereto shall be filed **on or before September 20, 1999.** Counsel shall furnish the Court with one chambers copy of such submissions.