**Julie FROST, a married woman,
Plaintiff—Appellant,**

v.

**INTEL CORPORATION; Intel Corporation Long–Term Disability Plan; Matrix Absence Management, Inc., Defendants—Appellees.**

No. 01–15972.

D.C. No. CV–98–01990–JWS.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 11, 2002.

Decided June 11, 2002.

Before SCHROEDER, Chief Judge, B. FLETCHER, and KOZINSKI, Circuit Judges.

## MEMORANDUM *

█ 1. Because Intel reserved the right to "modify, alter, or amend" the 1988 plan, Frost is subject to the plan terms that were in effect at the time she made her claim. *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1159 (9th Cir.2001). Therefore, the district court correctly held that the 1991 plan (hereinafter, the "Plan") applies.

█ 2. When an ERISA plan gives its administrator discretion to determine benefits eligibility, we review a decision denying benefits for abuse of discretion, unless there is a conflict of interest. *Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d 1130, 1144 (9th Cir. 2001). Even if there is a conflict of interest, we review the plan administrator's decision for abuse of discretion unless plaintiff comes forward with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Id.* at 1145 (quoting *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323 (9th Cir.1995)). Assuming without deciding that an actual, serious conflict of interest exists, we agree with

the district court that Frost has failed to produce evidence that it "caused a breach of the administrator's fiduciary obligations to the beneficiary." Frost argues that she has met this burden by presenting evidence that: (1) Intel used the wrong plan policy; (2) the claims administrator failed to accurately relay to her supervisors the records, reports and opinions of Frost's treating physicians; (3) Intel, by choosing doctors who were likely to find that Frost was not disabled, "solicited medical opinion[s] contrary to Frost's interests;" (4) Intel departed from the Plan's definition of "Objective Medical Findings"; and (5) Intel departed from the express purpose of the Plan. We reject all of these arguments. For the reasons stated above, *see* p. —— *supra,* the 1991 plan controls. The claims administrator presented the treating physicians' entire medical record to the Appeals Committee before their final rejection of the claim. Frost cites to nothing in the record to support her arguments that Intel "solicited medical opinion[s] contrary to Frost's interests." After a de novo review of the record, we disagree with Frost that Intel departed from the Plan's language or purpose. *See Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir. 1996), *rev'd on other grounds by Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999) (en banc). Therefore, we review the Plan administrator's decision to deny benefits for abuse of discretion.

3. The Plan required Frost to support her claims of disability with "Objective Medical Findings," which it defined as "a measurable abnormality which is evidenced by one or more *standard medical diagnostic procedures* ... that support the presence of a disability or indicate a functional limitation." (emphasis added). The

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Circuit Rule 36–3.

Plan administrator found that Frost did not support her disability claim with such evidence. We review that finding of fact for clear error. *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1473 (9th Cir.1993).

■ Frost's treating physicians diagnosed her as suffering from Chronic Fatigue Immune Deficiency Syndrome ("CFIDS") and Fibromyalgia. They concluded that these conditions were disabling. Frost asserts that one of her treating physicians, Dr. Scott Rigden, provided lab tests to the Plan administrator showing what he described as symptoms of CFIDS and Fibromyalgia. Two of these test results showed the presence of occult (hidden) blood in Frost's stool, and the results of a thyroid test showed abnormally high levels of the hormone TSH.

The Plan administrator did not commit clear error in finding that these test results did not constitute objective medical findings. Rigden never explained how occult blood, which is an indication of bleeding in the intestinal tract, supported a finding of the presence of CFIDS. Rigden later said in his deposition that the occult blood was most likely caused by hemorrhoids, and that he did not "think that the bloody stools was [sic] related to [chronic fatigue syndrome]" or any other disability. Rigden described Frost's thyroid tests as "abnormal" when they were conducted in May 1996, but matters had improved by the time Matrix rejected Frost's claim. On December 12, 1996, Rigden wrote to Matrix that the blood in Frost's stool and her "extremely abnormal thyroid test" suggested that "there certainly was a significant period of time where she was disabled by this thyroid condition alone," but that "[a]t this time, we are hopeful that these conditions are regulated." Shortly after receiving the test results showing high TSH levels in Frost's thyroid, Rigden referred Frost to Dr. Robert Biesbroeck

for specialized treatment. Biesbroeck diagnosed Frost with "Hashimoto's thyroiditis with associated hypothyroidism" in June 1996, but, after treating her, Biesbroeck concluded in August 1996 that "she should be feeling better from the thyroid standpoint. I doubt that her symptoms at this point are related to her thyroid." In his deposition, Rigden said that Frost's thyroid problems had been successfully treated and would remain "treated for the rest of [Frost's] life." Given these opinions from Frost's treating physician, the Plan administrator did not clearly err in concluding that the bloody stools and the thyroid test results did not constitute objective medical findings.

■ Rigden also presented test results that he said showed abnormal liver detoxification. The liver test results appeared in a Liver Detoxification Profile generated by the Great Smokies Diagnostic Laboratory, a "homeopathic" laboratory. One of Frost's treating physicians, Dr. Nathan Goldenthal, said in a deposition that he does not routinely use the Great Smokies lab and that he did not believe the Liver Detoxification Profile was "standard care." Rigden said in his deposition that the Liver Detoxification Profile was part of a "study protocol," and that Great Smokies therefore conducted the test for free. He acknowledged that it was "a very innovative test" at the time. Given these treating physicians' statements, the Plan administrator did not clearly err in concluding that the Liver Detoxification Profile did not constitute a "standard medical diagnostic procedure[ ]" and therefore could not support an objective medical finding under the Plan.

■ Frost argues that a test showing the presence of Mycoplasma bacteria in her blood also constitutes an objective medical finding. However, while these test results were provided to the Plan administrator, Frost fails to cite to any

evidence that she ever argued that the Mycoplasma test constitutes an objective medical finding. Significantly, Frost did not provide the Plan administrator with any medical opinion supporting a link, or even a correlation, between Frost's Mycoplasma and a disability. Neither Rigden nor any other physician pointed out the Mycoplasma test results to the Plan administrator, or explained their significance. Frost does not appear to have argued that the Mycoplasma was significant until she began this litigation. The abuse of discretion standard permits us to review "only the evidence presented to the plan"; we cannot consider new medical arguments that Frost never presented to the Plan administrator. *Taft,* 9 F.3d at 1471 (internal quotation marks omitted). Thus, we cannot conclude that the Plan administrator clearly erred by failing to find that the presence of Mycoplasma bacteria in Frost's blood was an objective medical finding.

■ Frost also argues that lab tests and MRIs submitted by Goldenthal constitute objective medical findings. Goldenthal performed the tests in 1999, more than a year after the Plan administrator finally rejected Frost's claim. They are therefore not part of the administrative record and we cannot rely on them to find an abuse of discretion. *Id.*

■ Aside from laboratory test results, Frost argues that her treating physicians performed other tests on her that constituted objective medical findings. These were (1) positive "trigger points test" results, in which the doctor presses on 18 points on the body with his thumb and asks the patient if he feels pain; (2) swollen nasal turbinates; (3) non-specific acneiform rashes; (4) tender anterior cervical adenopathy; (5) a tender abdomen; (6) a positive crimson crescent sign in Frost's pharynx; (7) "abnormal mental status"; (8) symptoms of neurological impairment

exhibited through subjective tests of Frost's coordination; and (9) a "general appearance upon every examination of exhaustion and overwhelming fatigue."

The Plan states that "[o]bjective medical findings do not include physicians' opinions or other third party opinions based solely on the acceptance of subjective complaints." To be "objective," a finding cannot depend on Frost's subjective complaints of pain or other symptoms. Thus, the Plan administrator did not clearly err in finding that a report from Frost's treating physician that she complained of "tender" body parts, or that she complained of pain when the doctor pressed certain points on her body, or that she appeared to lose her balance when she closed her eyes, or that she failed to properly point her finger to her nose, or that she was unable to perform mental arithmetic, or that she appeared fatigued, did not constitute an "objective" medical finding within the Plan's definition.

■ The Plan administrator also did not clearly err in concluding that the other physical symptoms Rigden observed did not constitute objective medical findings of disability. The Plan's definition of objective medical evidence requires that "the test result must be clearly recognizable as out of the range of normal for a healthy population; the significance of the abnormality must be understood and accepted by the medical community." Rigden said in his deposition that Frost's swollen nasal turbinates were "compatible with an allergy." Rigden said the acneiform rashes were not causally linked with chronic fatigue syndrome, that they could have been caused by diet, and that the nature and extent of the rashes was not "subject to measurement." The observation of tender anterior cervical adenopathy–swollen glands in the front and side of the neck–was based in part on Frost's subjective complaint and, according to Rigden, is a

typical symptom of several diseases, including the common cold. Rigden said the crimson crescent sign in Frost's pharynx occurs in five to ten percent of the general population, can be caused by sinus problems, and does not keep a person from working. The Plan administrator did not clearly err by concluding that these observations were not objective medical findings within the Plan's definition.

\* \* \* \* \* \*

The district court did not err in concluding that the Plan administrator did not abuse its discretion in denying Frost's benefits claim.

AFFIRMED.