[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 4, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14288

_____

D. C. Docket No. 04-00043-CV-T-26-MSS

SUSAN WANGENSTEIN,

Plaintiff-Appellant,

versus

EQUIFAX, INC.,

Defendant,

LUMBERMENS MUTUAL CASUALTY COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 4, 2006)**

Before EDMONDSON, Chief Judge, KRAVITCH, Circuit Judge, and
MIDDLEBROOKS,* District Judge.

---

* Honorable Donald M. Middlebrooks, United States District Judge for the Southern
District of Florida, sitting by designation.

KRAVITCH, Circuit Judge:

Susan Wangenstein appeals from the district court's grant of summary judgment in favor of Lumbermens Mutual Casualty Company ("Lumbermens"), and the court's denial of her summary judgment motion, in her suit seeking to overturn the denial of her long term disability ("LTD") benefits pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"). For the reasons that follow, we affirm.

## I. Background

Wangenstein worked for Equifax, Inc. ("Equifax") as a Customer Service Representative from 1996 until July 16, 1999, when she was diagnosed with cervical spondylosis[1] with myelopathy[2] and migraine headaches.[3] She was a covered "participant" in Equifax's LTD plan, which was insured by Lumbermens and administered by Kemper National Services ("KNS"), a wholly-owned

---

[1] Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots." Dorland's Illustrated Medical Dictionary 1564 (28th ed. 1994).

[2] Myelopathy is a general term denoting functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. Id. at 1090.

[3] Wangenstein suffered from and received treatment for her migraines for at least two years prior to leaving her job.

subsidiary of Lumbermens.[4]

Lumbermens' LTD policy (the "policy") defines "disabled/disability" as:

[O]ur determination that a significant change in your physical or mental condition due to:

1. Accidental Injury;
2. Sickness;
3. Mental Illness;
4. Substance Abuse; or
5. Pregnancy,

began on or after your Coverage Effective Date and prevents you from performing, during the Benefit Qualifying Period and the following 24 months, the Essential Functions of your <u>Regular Occupation</u> or of a Reasonable Employment Option offered to you by the Employer, and as a result you are unable to earn more than 60% of your Pre-disability Monthly Income.

After that, you must be so prevented from performing the Essential Functions of <u>any Gainful Occupation</u> that your training, education and experience would allow you to perform."

(Emphasis added.) The former are "own occupation" benefits, and the latter are "any occupation" benefits. The policy further provides that benefits will be terminated when a participant "fail[s] to provide written proof of [her] Disability that we determine to be satisfactory." The plan's proof of loss section provides that the insurer "may require proof from time to time that [the participant]

---

[4] During 2002 and 2003, Lumbermens sold KNS to a company that was eventually renamed Broadspire Services, Inc. ("Broadspire"). By July 2003, KNS ceased to exist; Broadspire had no corporate connection to Lumbermens.

continue[s] to be unable to work due to sickness or injury, and under the Regular and Appropriate Care of a Physician."

On July 25, 2000, Dr. Jayam K. Iyer, Wangenstein's treating physician, wrote in a letter to KNS that an MRI of Wangenstein's cervical spine taken in August 1999 showed:

> disc protrusion at C3-4 level, spondylosis, more advanced at C4-5, C5-6 level, bulging discs at multiple levels with spondylitic lipping. She also has a central disc protrusion at C5-6 level with herniated nucleus pulposis, cervical radiculopathy and status-post mini-stroke with numbness of right side of the face and arm.

Dr. Iyer noted that, "Wangenstein also suffers from intense-to-moderate amount of muscle spasm, chronic pain syndrome and cervicogenic headache," which "is complicated by her right hemicranial, right ophthalmic migraine." Dr. Iyer concluded that Wangenstein was "totally and permanently disabled" and "not capable of any gainful employment."

Thereafter, KNS had Dr. Gerald Goldberg, a neurologist, conduct a Peer Review Consultation. Dr. Goldberg did not personally examine Wangenstein. After reviewing Dr. Iyer's notes, and without reviewing the MRI of Wangenstein's cervical spine, Dr. Goldberg opined that there was not enough objective data to support Wangenstein's LTD status. He wrote that except for a decreased range of motion of the cervical spine, "her neurological exam was nonfocal." He further

4

noted the absence of details surrounding the "mini-stroke" Dr. Iyer had mentioned. Dr. Goldberg also commented on one of Dr. Iyer's notes, dated January 11, 2000, indicating that Wangenstein's migraines were controlled by injections of Imitrex. Dr. Goldberg stated that "her complaints continue to be subjective and it is difficult to separate what might be organic and what might be related to her attempts to get on disability for her ongoing subjective symptoms." He concluded that, from a neurological standpoint, there was not "enough objective data to support long term disability," and he recommended additional neurological evaluation and treatment, psychiatric evaluation, and an Independent Medical Examination ("IME").

Following Dr. Goldberg's review, KNS sent Wangenstein for an IME with Dr. Harish Patel, also a neurologist, who conducted an exam and documented some cervical and lumbosacral spasm with a restricted range of motion in the cervical spine. Patel noted Wangenstein had a history of neck pain, neck manipulation, vascular headaches, narcotic dependency for relief from headaches and depression and narcotic withdrawal and determined she was "partially disabled, and may be able to perform part-time work as tolerated." Thereafter, Wangenstein received "Own Occupation" disability benefits, effective October 15, 1999.

By letter dated May 1, 2001, KNS informed Wangenstein that her 24-month Own Occupation benefits period was coming to a close and requested that she

supply updated medical documentation of her condition so that KNS could evaluate whether she qualified for "Any Occupation" benefits. KNS asked her to sign a medical release authorization, fill out a questionnaire, and cooperate with vocational consultants. Wangenstein complied with all requests.

By letter dated May 21, 2002, KNS requested that Dr. Iyer forward "[a]ll current office and/or chart notes, along with any objective documentation you may have including labs, blood work, x-rays, MRI results and the results of any other diagnostic tests for the period of May 2001 to present."

KNS sent Dr. Iyer a letter dated September 24, 2002, requesting medical records beginning June 2002 and requesting that he fill out certain forms relating to Wangenstein's disability. On November 7, 2002, KNS again requested the above materials from Dr. Iyer. KNS sent a similar letter to Wangenstein, also dated November 7, 2002, requesting that she provide "ongoing proof of [her] disability" and stated that KNS needed forms completed by Dr. Iyer as well as all current "office and/or chart notes, MRI results, x-rays, operative reports and the results of any diagnostic tests for the period of treatment June 2002 to present." The letters warned that failure to submit the requested materials by December 7, 2002 would result in termination of benefits without further notice.

In November 2002, Dr. Iyer responded, indicating that Wangenstein had

cervical spondylosis with no chance of improvement and listing a number of work restrictions, including: no sitting, standing, or walking for long periods, no reaching, no lifting, carrying, pushing or pulling, no bending, and no repetitive movements. According to Dr. Iyer, in a typical 8-hour work day, Wangenstein could sit for no more than one hour with rest, could stand no more than one hour with rest and could walk no more than one hour with rest. Dr. Iyer concluded that Wangenstein could not work at all.

On December 13, 2002, Dr. Goldberg conducted a second review of Wangenstein's file, concluding that "no objective clinical findings" supported Wangenstein's "inability to work, either at her own sedentary job or at any occupation." He further concluded that "there is nothing to suggest that she has restrictions of [sic] limitations." Dr. Goldberg suggested that "a more detailed neurological exam" and "imaging studies of the cervical spine" would be helpful in evaluating Wangenstein's claim in the future. On that basis, KNS informed Wangenstein that "the records do not document that you are disabled" under the "any occupation" clause. KNS requested that Wangenstein provide additional documentation, which could "include, but would not be limited to a detailed neurological exam and imaging studies of the cervical spine" by February 28, 2003 if she wished to continue receiving benefits.

On March 6, 2003, Dr. Vaughn Cohan, another neurologist, completed a second Peer Review. Dr. Cohan reviewed a copy of Dr. Goldberg's report, forms and medical records provided by Dr. Iyer, a May 2001 LTD Questionnaire completed by Wangenstein and additional medical documentation "recently received by claimant including letter dated 2/4/03, by Dr. Iyer and MRI dated 2/5/01." Dr. Cohan determined that the record failed to support functional impairment that precluded work. He wrote that "Dr. Iyer supplies no objective documentation to support his opinions regarding work functionality and the restrictions and limitations listed . . ." Dr. Cohan also suggested additional information that would be relevant in evaluating Wangenstein's claim, including: (1) "a detailed electrodiagnostic evaluation including EMG and nerve conduction testing"; (2) "a detailed report from board certified neurologist and board certified orthopedist including detailed neurologic physical examination findings and detailed orthopedic/mechanical physical examination findings"; (3) "if previously performed, the results of any cervical myelography and postmyelography CT scan studies"; and (4) "a Functional Capacity Evaluation and/or Independent Medical Evaluation."

By letter dated May 1, 2003, KNS denied Wangenstein LTD benefits, stating that Dr. Iyer's findings were unsupported by medical data. KNS conducted a wage

survey and determined that she was capable of the following occupations based on physical capacity, education and work history: Customer Service Representative, Mortgage Clerk and Teller.

Wangenstein appealed the denial, and in a May 13, 2003 letter, Dr. Iyer wrote that Wangenstein "has intractable cervical facet syndrome" and suffers from migraines. He explained that a clinical examination, MRI of the brain, and EEG would be useless because they would not show evidence of migraines. Dr. Iyer stated that she had provided "enough information on the cervical MRI regarding cervicogenic headaches for cervical facet syndrome" and that, with respect to the migraines, "there is no diagnostic tool, other than the patient's history and the patient's affect during the episodes of migraines" and that no other documentation could be provided. Dr. Iyer further opined that if Wangenstein takes a job, "she will be calling in sick because of the migraines. Her work hours will be very unpredictable. She will not be able to talk to the people in customer service because any noise or tension, etc. trigger migraines. . . ."

In June, KNS had Drs. Robert Ennis and Eddie Sassoon perform additional peer reviews. Dr. Ennis, an orthopedic surgeon, reviewed Wangenstein's file and reached the same conclusion as Drs. Cohan and Goldberg, stating that "[d]ue to the lack of objective documentation at the present time it is not possible to make a

9

determination that she is disabled from performing any occupation." Dr. Ennis also repeated Dr. Cohan's suggestions regarding additional tests and documentation that would be helpful in evaluating Wangenstein's disability claim.

Dr. Sassoon, a specialist in Physical Medicine and Rehabilitation, noted that the detailed electrodiagnostic evaluation and myelographic studies recommended by Dr. Cohan had not been provided. Dr. Sassoon further stated that "the records obtained essentially reveal no evidence of acute neurologic or orthopedic deficits which would preclude sedentary level activity on at least a part time basis." Accordingly, he concluded that Wangenstein was not disabled from performing any occupation, and KNS again denied Wangenstein's appeal.

Wangenstein challenged the denial in district court, and the parties ultimately filed cross motions for summary judgment. The court granted summary judgment in favor of KNS, concluding that KNS was not wrong in denying Wangenstein's benefits claim. The court found that although the administrator may have ignored the peer review physicians' requests for additional neurological tests and although Goldberg was not provided with the results of Wangenstein's MRI, Wangenstein failed to respond to the administrator's repeated requests for objective medical documentation. The court stated that although Wangenstein had seen numerous neurologists apart from Iyer, she never submitted any more specific

tests regarding her cervical spine pain and mobility, justifying the denial of her

LTD benefits. Wangenstein now appeals.

## II. Standard of Review

We review a district court's ruling on a motion for summary judgment in an

ERISA case de novo, applying the same legal standards that governed the district

court's disposition. Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134

(11th Cir. 2004).

We apply the following procedure in reviewing denials of benefits under

ERISA plans:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38. We follow this approach in reviewing both an administrator's

interpretation of a plan and its factual determinations. Id. at 1134 n.3. Here, the parties agree that KNS was vested with discretion and that, therefore, the arbitrary and capricious standard applies here in some form. They disagree, however, regarding whether the heightened standard applies.

Wangenstein argues that KNS is conflicted because, although LTD benefits are not paid out of its own assets, they are paid out of the assets of its parent corporation, Lumbermens. Wangenstein contends that KNS has an interest in conserving its parent's assets. She relies on Brown v. BellSouth Telecomms. Inc., 73 F. Supp. 2d 1308 (M.D. Fla. 1999), in which the court applied the heightened arbitrary and capricious standard because the employer both made the claims decisions and paid LTD benefits directly out of its operating expenses. Id. at 1324. The employer was thus clearly conflicted with respect to LTD benefits. The Brown court proceeds to discuss, however, that disability pension benefits were paid out of a separate trust established by the employer's parent corporation. Although the trust was funded through periodic contributions by the subsidiaries, including the defendant, the parent corporation apparently owned the trust. On that basis, the court concluded that the employer, which also administered the plan, "would feel duty bound to conserve its corporate parents' funds." Id. at 1324.

In contrast to the situation in Brown, here LTD benefits are paid out of

12

Lumbermens' assets so that payments to Wangenstein would not have any direct impact on KNS's operating funds. Even where the party making the benefits determination is the wholly-owned subsidiary of the insurance company responsible for paying the claims, the heightened arbitrary and capricious standard would not apply unless "the plan-payout funding source retains ultimate control over the pay-out decision." Williams, 373 F.3d at 1136; Buce v. Allianz Life Ins. Co., 247 F.3d 1133, 1141 (11th Cir. 2001) (holding that the heightened arbitrary and capricious standard applies where a plan administrator, despite delegating its claim processing duties to a third party, exercises the "ultimate authority to determine for itself whether payments should be made out of its own assets.").

Here, not only is there no allegation that Lumbermens retained ultimate control over the decision to pay benefits, there is no allegation that Lumbermens even communicated with KNS regarding Wangenstein's claim. Moreover, unlike the situation in Buce, here there is no allegation or evidence suggesting that KNS was dependant on the patronage of Lumbermens. See id. at 1141. Where, as here, the party that must pay the claims does not retain ultimate control over the benefits determination, the heightened arbitrary and capricious standard is inapplicable. This is the case even where, as here, the company making the benefits determination is a wholly-owned subsidiary of the insurance company that must

13

pay the claim.

## III. Discussion

In accordance with the procedure outlined above, we first consider whether KNS was wrong in determining that Wangenstein is not disabled from performing any gainful occupation.

Wangenstein argues that the district court erred in concluding that she was not disabled from performing any occupation and that the court's error derives from its focus on her orthopedic conditions and its failure to appreciate that her claimed disabling condition was solely chronic migraine headaches. Wangenstein contends that she could not have provided objective evidence of her chronic migraines because migraines are diagnosed exclusively via a patient's subjective complaints. Wangenstein relies primarily on Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997), in which the Third Circuit held that it was arbitrary and capricious for an administrator to deny LTD benefits because the claimant did not provide objective medical evidence of chronic fatigue syndrome. Id. at 442. The Mitchell court held that the administrator did not identify any more objective evidence that the claimant could have submitted in support of his disability claim. Wangenstein argues that, like the insurance company in Mitchell, Lumbermens is trying to add a "clinical evidence of etiology" requirement for LTD benefits not

14

found in the text of the plan.

Under ERISA, the plaintiff has the burden of proving her entitlement to contractual benefits. See Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998). In other words, Wangenstein bears the burden of proving that she is "so prevented from performing the Essential Functions of any Gainful Occupation that [her] training, education and experience would allow [her] to perform."

Wangenstein argues that she met her burden because: (1) Dr. Iyer repeatedly and unequivocally stated that Wangenstein is completely disabled due to her migraines; and (2) Dr. Patel, who performed an IME on Wangenstein at Lumbermens' request, made findings that comport with those of Dr. Iyer, specifically that Wangenstein was "partially disabled, and may be able to perform part-time work as tolerated." Furthermore, Wangenstein contends that, as Dr. Iyer stated in a May 2003 letter to KNS, "there is no diagnostic tool, other than the patient's history and the patient's affect during the episodes of migraines, and there is no other documentation we can provide regarding the migraine headaches."

Drs. Iyer and Patel, however, were not the only specialists to evaluate Wangenstein's condition. Four other doctors performed paper reviews of Wangenstein's file, and all concluded that the evidence did not establish that

15

Wangenstein was disabled from performing any occupation.

Dr. Goldberg twice reviewed her file, although he was not provided with Wangenstein's MRI results in either instance. Following his second review, Dr. Goldberg concluded that, "[b]ased on the information presented by Dr. Iyer, which do not include any x-rays or MRI scans of the cervical spine to document spondylitis disease, there are no objective clinical findings that would support an inability to work, either at her own sedentary job or at any occupation." (Emphasis added.)

Dr. Cohan completed a peer review on March 11, 2003, in which he recounted the work restrictions listed by Dr. Iyer and then stated that "Dr. Iyer supplies no objective documentation to support his opinions regarding work functionality and the restrictions and limitations listed . . ." (Emphasis added.) Dr. Cohan found that although Dr. Iyer discussed Wangenstein's history and her imaging study results, she "supplie[d] no objective data to support" her opinion that Wangenstein is permanently and totally disabled. (Emphasis added.) Dr. Cohan noted that the detailed neurological physical examination report recommended by Dr. Goldberg was not supplied but that, in any case, "upon retrospective review of the claimant's physical examination findings as recorded over a period of several years by Dr. Iyer, there does not appear to be any evidence

16

of significant neurologic dysfunction." He concluded that "the medical documentation submitted for review fails to demonstrate objective evidence of a functional impairment of sufficient severity and intensity as to preclude the claimant from returning to any occupation" and that "[r]estrictions and limitations would be those consistent with sedentary work . . ." (Emphasis added.)

Dr. Ennis completed a peer review on June 25, 2003, in which he reviewed the results of an MRI of Wangenstein's brain, an electroencephalogram, an MRI of the cervical spine and her medical records and concluded that "[t]here is no reflex, sensory or motor change, muscle weakness or specific documentation of functional limitation that would prevent the claimant from working at any occupation at the present time." Dr. Ennis noted that additional documentation would be helpful, including: a complete physical examination by a Board Certified neurologist and orthopedist detailing neurological and physical findings, a current electrodiagnostic study and nerve conduction testing, and a Functional Capacity Evaluation.

Finally, Dr. Sassoon completed a peer review on June 26, 2003, in which he noted that the record lacked the following evidence: a Functional Capacity Evaluation; a detailed electrodiagnostic evaluation; and myelographic studies to help identify the pain generator. Dr. Sassoon concluded that "the records obtained essentially reveal no evidence of acute neurological or orthopedic deficits which

17

would preclude sedentary level activity on at least a part time basis" and that Wangenstein is therefore not disabled from performing any occupation.

Thus, the doctors who evaluated Wangenstein disagreed regarding what weight to accord the subjective evidence of her disability. Wangenstein argues that the administrator should have credited the opinions of her treating physician and Dr. Patel, the only two doctors who actually examined her, rather than the opinions of the four doctors who reviewed her medical records. Wangenstein also notes that neither Dr. Goldberg nor Dr. Cohan appears to have reviewed the report of Dr. Patel's IME when conducting their peer reviews.[5] However, Dr. Patel's IME report is listed as among the documents considered by Drs. Ennis and Sassoon in their peer reviews.

In Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), the Supreme Court instructed that

> courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Id. at 834. On the other hand, although administrators are not required to defer to a

---

[5] Dr. Cohan does not list the IME report as being among the documents provided to him, and he notes at the end of his evaluation that "a Functional Capacity Evaluation and/or Independent Medical Evaluation would be relevant in further evaluation of the claim."

treating physician's opinion on disability, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." Id. Here, the administrator did not arbitrarily refuse to credit the opinions of Drs. Iyer and Patel, but rather accorded greater weight to the conflicting opinions of Drs. Goldberg, Cohan, Ennis and Sassoon.

Furthermore, KNS had at least one reason to accord greater weight to the opinions of Drs. Goldberg, Cohan, Ennis and Sassoon. In his second peer review, Dr. Goldberg noted that Dr. Iyer's findings were somewhat equivocal in that Dr. Iyer stated, in a single paragraph, that Wangenstein had both "decreased range of motion of her neck" and "good range of motion of the cervical spine."

Furthermore, as the district court noted, Wangenstein failed to provide the detailed neurological examination reports that KNS repeatedly requested. The record reveals that Wangenstein saw numerous neurologists in addition to the peer reviewers mentioned above, yet she failed to submit the requested reports. Wangenstein's contention that the detailed reports would not have affected the migraines diagnosis does not excuse her failure to submit them to KNS.

In any event, even if we were to conclude that KNS was wrong in finding that Wangenstein was not disabled from performing the duties of any occupation, that would not end our inquiry. Instead, we would next consider whether KNS's

19

decision was arbitrary and capricious. "A decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision." Shannon v. Jack Eckerd Corp., 113 F.3d 208, 210 (11th Cir. 1997).

First, Wangenstein's heavy reliance on Mitchell is misplaced. In that case, the Third Circuit noted that "[a]lthough in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this Plan and CFS." 113 F.3d at 442-43. Thus, the Mitchell holding is more narrow and fact-based than Wangenstein asserts. Moreover, the Mitchell court noted that, in that case, the plan administrator was presented with "undisputed evidence" showing that the applicant could not sustain regular paid employment because he suffered from chronic fatigue syndrome." Id. at 440. And in rejecting the plaintiff's benefits claim, the administrator issued only "terse" letters, merely stating that the plaintiff had failed to tender "objective medical evidence" that he was disabled under the plan's terms. Id. at 442. In contrast, here KNS did not simply ignore the opinions of Drs. Iyer and Patel, but rather placed greater reliance on the opinions of its peer reviewers, who generally cited a lack of objective evidence that Wangenstein was disabled from performing the duties of any occupation in

20

concluding that she had not established her entitlement to benefits.

Furthermore, given that KNS has discretion in terms of what it considers adequate "proof" of continuing disability, we cannot say that it is unreasonable for KNS to demand objective evidence. Thus, we hold that KNS was not arbitrary and capricious in requiring objective evidence of disability and crediting the opinions of the four peer review physicians over those of Drs. Iyer and Patel.

Finally, Wangenstein argues that the Employability Assessment Report was in error in identifying full-time jobs that Wangenstein could perform, as the record does not demonstrate that she is capable of full-time employment. Dr. Goldberg, however, found that Wangenstein had no work restrictions or limitations, and Dr. Cohan only listed that she should not be required to perform excessive overhead activities. Although this court may have concluded otherwise on the basis of reports by Drs. Iyer and Patel that, at most, Wangenstein was capable of part-time employment, we cannot say that KNS was arbitrary and capricious in finding that she was capable of performing the duties of a full-time sedentary occupation. Accordingly, we conclude that KNS was not arbitrary and capricious in denying Wangenstein's claim for LTD benefits. We AFFIRM the district court.

MIDDLEBROOKS, District Judge, concurring in part and dissenting in part:

I concur in Part II of the majority's opinion. I also agree with the majority's analysis and conclusion insofar as Wangenstein's objectively verifiable medical conditions – cervical spondylosis and myelopathy – are concerned. I dissent from Parts I and III of the opinion, however, because I believe that KNS unreasonably dismissed or otherwise failed to evaluate Wangenstein's claim of disability due to migraine[1] solely on the basis that she submitted no objective evidence to prove it.

In her November 16, 1999 application for disability benefits, Wangenstein described her "illness/injury" as including both objectively verifiable conditions, such as degenerative disc disease, and the subjective condition of "migraine." KNS awarded Wangenstein "own occupation" benefits only after an IME concluded that she was partially disabled due objectively verifiable conditions of which she was complaining.[2] Nevertheless, the record shows that Wangenstein sought and received treatment for migraines at the same time, and continued to do so throughout KNS' evaluation of her eligibility for benefits.

Monthly records reflect that Wangenstein regularly complained of recurring

---

[1] Migraines are "episodic, disabling headaches that may recur over years" and can be debilitating. Sharon Parmet, Headaches, 295 J. Am. Med. Ass'n 2320 (May 17, 2006). They are often associated with irritability, nausea, vomiting, constipation or diarrhea, and sensitivity to light or sound. Dorland's Illustrated Medical Dictionary 1042 (28th ed. 1994).

[2] Dr. Patel noted cervical and lumbosacral spasm, and a limited range of motion.

22

and disabling migraines, including symptoms of severe pain, vomiting, and sensitivity to light and sound.[3]  Wangenstein's migraines were at times her chief complaint, sometimes appeared to aggravate her other medical problems, and from time to time seemed "under control" with medication.

On January 11, 2000, Dr. Iyer wrote that Wangenstein reported having one to two migraines per week that are "controllable,"[4] although, even with medication, "when the migraine comes, she cannot handle it . . . she is throwing up . . . she is overall affected by pain in the right side of her face . . . [she] is unable to function and take care of her daily activities."  As of April 19, 2000, Dr. Iyer noted that Wangenstein continued to report near-daily headaches, and that the injections she received from him for the pain only "tend[ed] to keep her away from the emergency room."  On July 11, 2000, Wangenstein reported that following treatment she would do well for about a week or so.  On July 18, 2000, Wangenstein returned to the doctor's office, stating that she was anxious and could not even sit because of a migraine.  In addition to severe pain, Wangenstein

---

[3] Women who, like Wangenstein, are between the ages of 50 and 64 and suffer from migraines average the highest number of bedridden days per year and the greatest length of bed rest for migraines compared to other groups.  X. Henry Hu, et al., Burden of Migraine in the United States, 159 Arch. Intern. Med. 813 (Apr. 26, 1999).

[4] Although the majority read this note as stating that the medication actually controlled the migraine headaches, I find Dr. Iyer's use of the word "controllable" to reflect a statement of opinion as to the potential of the medication's efficacy.

reported that she was also experiencing vomiting and shaking.

On July 25, 2000, a year after Wangenstein began disability leave, Dr. Iyer wrote to KNS that Wangenstein's "right hemicranial, right opthalmic migraine," which the doctor described as "persistent and permanent," was complicating her other medical conditions. He concluded that she was not capable of working, and was in need of chronic pain management and oral medication.

Dr. Iyer treated Wangenstein's migraines with an array of pain medication administered orally and by injection. Her response to the treatments varied. On March 19, 2001, Wangenstein reported that she was on the fourth day of a migraine attack, and was able to get over the "crisis" only after taking Imitrex both orally and by injection. In a May 8, 2001 KNS questionnaire, Wangenstein wrote: "Because of constant pain in face, eye and head, vomiting and hot and cold sweats from pain, I am constantly in bed all day, I only go out of the house when I have a doctor's appointment." At what may have been her highest point, in July 2002 Wangenstein reported that "she had not had any headaches for at least four days," and that this was "the best she ha[d] ever felt." Wangenstein and her doctor discussed reducing her narcotic intake and treating her with methadone, but Wangenstein hesitated because she feared that she would be in "horrendous pain." In September 2002, after an attempt to modify the medicinal regimen,

24

Wangenstein found that she could not tolerate the methadone. She reported that "the pain is constant. She has been vomiting and nauseated for the last five days. The Imitrex is not helping." Wangenstein also complained that she could not sleep because the pain would wake her up. At that point, in addition to other medications, she and her doctor discussed "[t]he possibility of hospitalization for intractable migraines[.]"

In October 2002, Wangenstein reported that although the current medication and treatment plan were helping, she knew she would have to deal with the inability to control migraines all of her life. In November 2002, Wangenstein again discussed chronic headaches and migraine. Dr. Iyer noted that although Wangenstein "controls the migraines with Imitrex shots . . . [t]here is no way she can reduce any pain medication. She is not getting any relief." Wangenstein described feeling "normal" by 6:00 PM, "but [that] all morning [she] is miserable because of the ongoing headaches." Wangenstein reported that "by the third day of the attack, she is okay, but she still has daily headaches."

On February 4, 2003, Dr. Iyer again wrote to KNS that Wangenstein's chronic, intractable and debilitating migraines, which she had been struggling for years to control, rendered her totally disabled. Dr. Iyer wrote that she would require regular treatment and care just to be able to take care of personal affairs.

25

Even when Wangenstein stated, during an April 2003 employability assessment, that she could perform basic activities of "daily living and personal care," she described that "her typical day is to stay in bed all day long due to her constant pain in her face, eyes and head," and that she only left the house when necessary to go to the doctor.

On May 1, 2003 Dr. Iyer wrote to KNS that Wangenstein's migraines were debilitating and intractable. Dr. Iyer stated that he recommended no employment because Wangenstein's condition is debilitating, chronic, and progressively getting worse.

Although, as the majority has shown, KNS thoroughly reviewed Wangenstein's claim of cervical spondylosis and myelopathy, KNS did not fairly consider all relevant evidence regarding Wangenstein's claim of disability due to migraine. Instead it disregarded symptoms and medical evidence that it found to be purely "subjective," including the extensive documentation of Wangenstein's complaints of – and treatment for – disabling migraine. KNS' Peer Reviewers based their conclusions as to whether Wangenstein was disabled on the sufficiency of the objective data.[5] While in its benefits denial letter KNS devoted several

---

[5] That KNS' Peer Reviewers may have briefly acknowledged Wangenstein's migraine complaints and diagnosis does not constitute fair consideration of that evidence, given their insistence on objective documentation to establish her disability.

26

paragraphs to explaining how it found insufficient objective evidence of a functional impairment related to Wangenstein's cervical spine condition, it only mentioned Wangenstein's "anti-migraine therapy" in passing. KNS' denial letter and subsequent correspondence affirming the denial of benefits did not discuss the evidence regarding her migraine symptoms at all.[6]

I disagree with the majority's conclusion that KNS was entitled to dismiss evidence of Wangenstein's disabling migraines solely on the basis that it was subjective, and to insist on objective evidence instead. As counsel for Lumbermens acknowledged at oral argument, no language in the Plan requires a claimant to furnish objective evidence to prove a claim of disability.[7] Rather, it only states that a claimant must provide "proof that you are unable to work due to sickness or injury," and that the proof must be "written." Nowhere in the Plan is "proof" defined to exclude evidence based on subjective reports. Other than with regard to conditions which fall under the rubric of mental health, the Plan does not

_____

[6] Compare Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228 (4th Cir. 1997)(affirming denial of benefits where medical consultants considered both objective and subjective evidence, and concluded claimant had sufficient functional capacity to work after assuming the accuracy of her self-reported symptoms and certain possible diagnoses which could not be verified). Note that in Ellis, the claimant's own physicians' reports were conflicting, and one of her examiners had suggested the possibility that she was embellishing her symptoms.

[7] Compare Boone v. Liberty Life Assurance Co. of Boston, 161 Fed.Appx. 469, 472 (6th Cir. 2005)(administrator entitled not to credit doctor's conclusions that claimant was disabled where those conclusions were not supported by objective medical evidence and plan defined proof of disability as requiring "objective medical evidence"). See also Frost v. Intel Corp., 37 Fed.Appx. 295 (9th Cir. 2002).

limit or exclude benefits for primarily subjective conditions. Dr. Iyer's statements that additional testing would be "normal" because there is no objective diagnostic tool for migraines, and that there was no other documentation he could have provided to prove that condition, are uncontested in the record.[8]

It is worth noting that Wangenstein's claim of debilitating migraines is not controverted in this record. Although KNS' peer reviewers found no objective medical evidence to support her claim of disability, none of them concluded that her reported symptoms were inconsistent with migraine, or that her migraine diagnosis was inconsistent with her other diagnoses. There is no video surveillance or other evidence contradicting Wangenstein's claims as to her limitations due to recurring migraine attacks and related symptoms. No examining physician has opined that she is a malingerer.[9]

_____

[8] I disagree with the majority's assessment that Wangenstein was not excused from providing the additional medical documentation KNS' peer reviewers sought. Although the Plan authorizes the administrator to require "any other proof we reasonably believe is necessary to evaluate your claim," it would not be reasonable to require a claimant to undergo, at her own expense, additional medical testing unrelated to the claimed disabling condition, where, as here, there is unrebutted evidence that additional testing would not prove the disability.

[9] I find Dr. Goldberg's statement that "it is difficult to separate what might be organic and what might be related to *her attempts to get on disability for her ongoing subjective symptoms*" to reflect his rejection of subjective evidence as adequate to establish disability. Dr. Goldberg, who only reviewed the paper record, did not have the benefit of examining Wangenstein in order to make any sort of credibility determination as to her subjective complaints. See, e.g., Smith v. Continental Casualty Co., 450 F.3d 253 (6th Cir. 2006)(finding that credibility determination regarding subjective complaints without the benefit of a physical exam supported a finding that benefits determination was arbitrary).

28

Unlike the majority, I believe that the central analysis in <u>Mitchell</u> is instructive here. In <u>Mitchell</u>, the Third Circuit held that it was arbitrary and capricious for an administrator to deny benefits for failure to submit "objective evidence," where the undisputed evidence showed that Mitchell suffered from chronic fatigue syndrome that precluded him from working; the plan only required Mitchell to show he was disabled, not to supply clinical evidence of the disease; and there was no more objective evidence Mitchell could have submitted given the absence of any "dipstick" test in the medical community for the syndrome, even though it is universally recognized as a severe disability. <u>See</u> <u>also</u> <u>Cook v. Liberty Life Assurance Co. of Boston</u>, 320 F.3d 11, 21 (1st Cir. 2003)(given that chronic fatigue syndrome was not verifiable by laboratory findings, it was not reasonable for administrator to require objective evidence of the condition where no contrary medical evidence was in the record).

Here, the evidence pertaining to Wangenstein's claim of disability *due to migraine* was not controverted, but simply dismissed or disregarded because it was "subjective." Dr. Iyer's statement that no objective diagnostic tool existed for the migraine condition was not rebutted. KNS' Plan did not require objective proof or otherwise exclude benefits for subjective conditions. I believe that KNS' denial of

29

benefits under these circumstances was arbitrary and capricious.[10] See also Van Cleave v. United States, 70 Fed.Cl. 674 (2006)(military board's finding that claimant's subjective reports were insufficient to establish migraine condition for purposes of disability rating was unreasonable where claimant was diagnosed with and treated for migraine, and record did not show any objective test for migraine).

Because KNS failed to consider all relevant evidence and unreasonably construed the Plan as to require objective evidence of a subjective condition, I would reverse. I would not, however, substitute my judgment for that of the administrator to conclude that Wangenstein has proven her claim based on this record. Rather, I would remand the matter to KNS for consideration all relevant evidence regarding Wangenstein's claim of disability due to migraine. See, e.g., Rekstad v. U.S. Bancorp, 2006 WL 1689217 at * 5-6 (10th Cir. 2006)(remanding benefits denial after finding that administrator failed to examine and give full and fair consideration to material portion of the relevant evidence).

---

[10] Wangenstein's case is perhaps more complex than Mitchell's, in a sense, because she also suffers from objectively verifiable conditions, the evidence of which KNS reasonably concluded did not support a finding of disability.