[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16671

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 27, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-00480-CV-3-CSC

GEORGE HELMS,

                                        Plaintiff-Appellant,

versus

GENERAL DYNAMICS CORP., a corporation,
THE GENERAL DYNAMICS SHORT TERM DISABILITY PLAN,
a welfare disability plan, et al.

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(February 27, 2007)**

**ON PETITION FOR REHEARING**

Before BIRCH, PRYOR and FAY, Circuit Judges.

BIRCH, Circuit Judge:

Appellant's petition for panel rehearing is GRANTED. We VACATE our prior opinion in this case and substitute the following in its place.

George Helms appeals the magistrate judge's entry of judgment in favor of General Dynamics Corporation ("General Dynamics") and Aetna Life Insurance Company ("Aetna") in his action for a wrongful denial of benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. We hold that Aetna acted arbitrarily and capriciously in denying Helms short-term disability ("STD") benefits, that Helms failed to exhaust his administrative remedies with respect to his long-term disability ("LTD") claim, and that Helms has an appropriate remedy under § 502(a)(1)(B). As a result, we REVERSE in part, AFFIRM in part, and REMAND for proceedings consistent with this opinion.

## I. BACKGROUND

Helms worked for General Dynamics as a functional analyst, a job that required him to work at a desk with a computer. Helms was covered under General Dynamics' ERISA-maintained STD and LTD benefit plans, which were administered by Aetna. The STD plan defines disability as a health condition that results in one's being "continuously unable to perform the essential duties of [one's] regular occupation in substantially the same manner as [one] did just before incurring a medically determined physical or mental impairment." R1, 29-5

at 20. The medical proof of disability required that Helms "[p]rovide the Claims Administrator with information from [his] physician that: -Verifies [his] Disability and - Explains the nature and extent of [his] Disability." Id. at 22. Helms was advised that Aetna could require Helms to submit to an exam by a physician selected by Aetna, otherwise known as an independent medical exam ("IME").

The STD plan provided for two levels of appeal, both with Aetna Disability Services. If Aetna denied a STD claim it would provide a written explanation that detailed "[t]he specific reasons for the denial, [t]he specific references in the plan document to support those reasons, [a] description of additional material or information [the claimant] could provide to support the claim -- and the reasons why that information is necessary, and [t]he procedures available for a further review of [the] claim." Id. at 28 (emphasis in original).

On 27 June 2003, Helms applied for and was granted STD benefits from 8 July 2003 through 18 August 2003 in connection with a medical leave for surgery to repair a torn rotator cuff. Helms's application listed his other health issues as high blood pressure, an enlarged prostate, and thyroid problems, but it did not mention headaches. On 20 August 2003, Dr. Larry W. Epperson, Helms's neurologist, submitted an Attending Physician Statement ("APS") stating that Helms suffered from chronic headaches. Dr. Epperson first had treated Helms on

3

27 February 2003 for complaints of nausea and daily headaches Helms had experienced for the several months. Dr. Epperson found the headaches "very worrisome." R1, 29-6, at 32.

In a follow-up visit on 11 March 2003, Helms described his headaches as constant. Dr. Epperson noted Helms's seizure in 1996 and that Helms's headaches were at the base of his skull and back. A magnetic resonance imaging ("MRI") scan of Helms's brain was normal and an MRI of Helms's cervical spine revealed a "small focal disc bulge on the right and right of the midline at C6-C7 with chronic appearing compression of the superior endplate at T2." Id. at 27. Dr. Epperson also changed Helms's medications because Lorcet Plus was too strong and Midrin was ineffective. Helms's neurologist also planned a follow-up in two months, suggesting Helms call for an update in three weeks if his condition did not improve.

Helms returned to Dr. Epperson with chronic headaches on 31 March 2003. Dr. Epperson's impression was "[c]hronic headaches, cervical spine, back of the base of his skull and top of his head with no meningeal signs." Id. at 29. Dr. Epperson noted Helms's history of lymphoma, discontinued Neurontin, and tried new medications, as well as Lorcet Plus again. Dr. Epperson also planned a

follow-up for five to six weeks later and recorded that he was considering a lumbar puncture.

Helms returned a little over two weeks later, on 15 April 2003, complaining of chronic headaches. Dr. Epperson noted that he was "really concerned about [Helms] in that he has history of lymphoma and has chronic headaches since mid-February." Id. at 27. While Helms did not appear ill at the appointment, he described the headaches as occurring daily, starting at the back and top of his head. Dr. Epperson made additional changes in medications and observed that Medrol Dosepak gave Helms significant relief when he was on it for a short period of time and recommended a follow-up in three to four weeks.

Dr. Epperson also scheduled a lumbar puncture to rule out lymphoma, carcinomatous meningitis, or any fungal infection. Approximately one week after the lumbar puncture, Helms complained of severe spinal headaches. Helms went to the emergency room and the hospital admitted him for observation and an epidural spinal blood patch. Dr. Epperson recorded that the blood patch resolved the spinal headaches but left Helms with a chronic headache in the occipital head region. Dr. Epperson wrote that Helms might require an occipital nerve block at his next appointment.

On 8 May 2003, Helms returned to Dr. Epperson for a follow-up. Dr. Epperson noted that Helms's headaches were "somewhat improved on Topomax; but [that] he fe[lt] horrible." Id. at 24. Helms told Dr. Epperson that he felt washed-out and fatigued and had difficulty doing his job at work. Dr. Epperson's impression was that Helms's fatigue and difficulty concentrating were side effects of the Topomax he was taking. As a result, Dr. Epperson tapered Helms off Topomax "fairly rapidly," began Helms on Neurontin, and planned a follow-up in four to five weeks. Id. At the end of his notes Dr. Epperson wrote: "Consider short-term disability and he may need long-term disability." Id.

On 2 June 2003, Helms returned to his neurologist and Dr. Epperson noted:

> Helms thinks he might be a little better. He is now off Paxil and Topamax and he feels better just being off those drugs. . . . He is very concerned about his work and he states he has difficulty working because of headaches and also his medications cause him to be sedated and drowsy at times.

Id. at 21. Dr. Epperson's impression was that Helms's chronic headaches were "much improved." Id. He recommended a follow-up in three to four months and considered other medications in the future for headache control.

On 20 August 2003, Dr. Epperson faxed to Aetna an APS that detailed Helms's chronic headaches and indicated his opinion that Helms was unable to

6

return to work, but capable of "[s]edentary work activity [as] moderate limitation of functional capacity." R1, 29-7 at 9-10.

On 26 August 2003, registered nurse Lorna Blackmer conducted a review of the forms submitted for Helms. Nurse Blackmer decided that Helms's restrictions on lifting with his right arm were only appropriate through 21 September 2003.

On 3 September 2003 Helms returned to Dr. Epperson for a follow-up regarding his chronic headaches and his history of lymphoma. Dr. Epperson wrote that Helms

> is doing remarkably well with no further headaches. He is also on Neurontin 300 mg one q.i.d., Trazodone qhs, Covera 180 qhs, and Synthroid. He is retired and is trying to get Disability and I totally support him. I have tried him on numerous medications with numerous trials in the past, as well.

R1, 29-6 at 19. Under the "Impressions" section Dr. Epperson wrote: "Chronic headaches, much improved on present regiment. Adverse side effects to Paxil and Topamax." Id. Under the "Plan" section, he advised: "1. Continue the above medications. 2. He may decrease his Neurontin eventually by one every month until he gets off Neurontin. Furthermore, he can decrease his Methadone . . . if he would like . . . 3. I support him in his endeavor to retire. 4. Follow-up in 3-4 months." Id.

On 11 September 2003, Dr. Epperson completed and faxed to Aetna an APS addressing Helms chronic headaches that noted that Helms's primary diagnosis was chronic headaches with a secondary diagnosis of lymphoma. Dr. Epperson described Helms's abilities/limitations as, "[n]o ability to work. Severe limitation of functional capacity; incapable of minimal activity." Id. at 10. Under the question "What medical restrictions/limitations are you placing on patient," Dr. Epperson concluded "unable to work." Id.

Nurse Blackmer conducted another review on 25 September 2003. She recorded restrictions and limitations (R&Ls) of "no R[eturn]T[o]W[ork]." R1, 29-12 at 5. The next day, according to Aetna's notes, Nurse Blackmer's review concluded that "[b]ased on lack of clarity of R&Ls and causation of impairment," Aetna should request the office visit notes from both Dr. D.D. Thornbury, the physician Helms saw for his rotator cuff injury, and Dr. Epperson. R1, 29-13 at 1. On 30 September 2003, Helms called to inquire about the status of his claim and Aetna told him that the medical records it had received "[were] not enough." Id.

On 3 October 2003, Dr. Epperson refaxed his 11 September 2003 APS, this time with additional comments. Under the heading "Objective findings that substantiate impairment," Dr. Epperson recorded that "[p]atient has [headaches] every day" and was "unable to function." R1, 29-6 at 12. Helms's neurologist

also indicated that he had tried several medications on Helms. On 6 October 2003 Aetna's notes reflect that Helms called to check on the status of his claim and told Aetna that his medications left him in a sedated state, that he could not drive, and that he had trouble focusing and concentrating.

Nurse Holly M. Johnson then reviewed Helms's claim on 8 October 2003. Aetna's notes indicated that "R&Ls MD advises no work due to chronic headaches" and concluded "[t]here [was] not enough objective medical information to support continued disability." R1, 29-13 at 3.

In a 13 October 2003 letter, Aetna advised Helms that his benefits had been terminated because "Aetna c[ould ]not certify [his] disability because [it did] not receive[] medical information to show that [he] remain disabled." R1, 29-4 at 7. The letter directed Helms to provide additional information if he had medical information he wanted Aetna to consider.

In a letter dated 14 October 2003, Dr. Epperson wrote to Aetna:

> Fortunately, we have found a combination that has worked, but it can cause mild sedation. He is applying for Disability and I totally support him in that endeavor. I do not believe he can function on the present medications coupled with his chronic daily headaches . . . . He cannot continue to work on medication and with chronic daily headaches.

R1, 29-6 at 15.

On 27 October 2003, Nurse Blackmer concluded that Helms's headaches were improved, that he was cutting down his medication, and that since he had worked with headaches while on medications before, she was "unclear as to what changed" beyond Helms's rotator cuff repair. R1, 29-13 at 5. She concluded "that medical does not support ongoing R&Ls . . . [Helms's] condition is improved so that his medication is being decreased and eliminated, so if [Helms] worked with more medication, [it is] reasonable [that Helms] could work now that [his symptoms] are so much better and medication is increased." Id.

On 30 October 2003, Aetna called Helms to explain the claim decision. The notes stated: "Advised that based on the medical, AP is indicating that [Helms] has lowered his meds. [Helms] stated that this is untrue, as he is still taking the same dosages" of medications for his headaches. R1, 29-14 at 1. On that same day, Aetna sent Helms a letter and Dr. Epperson a fax regarding Aetna's denial of Helms's STD claim. The letter to Helms stated, for a second time, that Aetna "c[ould ]not certify your disability because we [did] not receive[] medical information to show that you remain disabled." R1, 29-4 at 10. Aetna's 30 October 2003 fax to Dr. Epperson stated that the medical information it had received did not support Helms's impairment past 22 September 2003. Aetna

10

requested the office visit notes from April 2003 to present, detailed R&Ls, and the results of any MRIs, X-rays, or any other tests results.

On 13 November 2003 Dr. Epperson provided Aetna with his office notes documenting his treatment of Helms. Nurse Blackner then reviewed Helms's claim, noting that "Dr. stated [Helms] is unable to work due to some slight sedation. However, no new medical given, no R&Ls given." R1, 29-14 at 2. She observed that Helms had a history of using "different medications, including Hydrocodone prior to LDW." Id. The review continued, concluding, "[b]ased on no R&Ls, given the fact that [Helms] is able to drive, do machinery, etc. medical continues to not support impairment." Id.

On 19 November 2003, Aetna upheld its termination of benefits in a letter to Helms, claiming, for the third time, that it "c[ould ]not certify your disability because we [did] not receive[] medical information that you remain disabled." R1, 29-4 at 15. Aetna's 19 November 2003 notes indicated that the "impairment is not supported past 9/22/03, as medical information does not have any R+L's." R1, 29-14 at 2.

Helms then submitted a written appeal. He argued that he had severe daily headaches that required strong medication to control and that he felt that methadone and Neurontin had an adverse effect on his ability to work and perform

activities commensurate with his duties as a computer systems analyst. Included

with Helms's appeal was a letter from Dr. Epperson that stated:

> Mr. Helms suffers from daily chronic headaches of a debilitating nature. He is presently taking medication to control the severity of the headache episodes. These medications, neurontin and methadone, cause sedation interfering with his ability to work or drive a vehicle and numerous other daily activities. Mr. Helms is unable to work while taking the medications required for his condition. He must have the medication to control the pain. Mr. Helms was seen by me in my office this date, his condition remains the same and he must continue his medication regime in order to control the pain.

R1, 29-7 at 19. Helms also provided a Social Security Administration ("SSA")

questionnaire with his appeal wherein Helms described some of the daily

difficulties he encountered. He stated that he had tried to refrain from taking

some medication so he could function at work but the intense pain would return

when he omitted medications. Aetna acknowledged receipt of Helms's appeal

and explained that Helms would receive a written response within 45 days or be

notified if an extension was necessary, and would be told why additional time is

needed. Aetna notified Helms within 45 days that it was extending the appeal

deadline by 45 days.

Aetna denied Helms's appeal and concluded that it was correct in its

original decision to terminate benefits. Aetna referenced Helms's SSA

questionnaire wherein Helms wrote that he was not able to drive often and that he had to lie down several times a day. Aetna concluded:

> [t]his questionnaire provides insight in to the activities Mr. Helms may be able to do or not do within the course of the day. It does not address any type of job related functions. It does not inquire about restrictions and or limitations, which would prevent Mr. Helms from returning to his position as a systems analyst.

R1, 29-7 at 12. Aetna's letter summarized Dr. Epperson's 14 October 2003 narrative note and concluded that it did not provide "medical information to substantiate a total disability from work as a systems analyst." Id. Aetna also decided that Dr. Epperson's 25 November 2003 narrative note provided "no new information to support restrictions and limitations from work." Id. The letter continued by stating that at the time Helms submitted his initial claim (relating to his rotator cuff), he did not mention recurrent headaches. Although Helms was out of work from 20 April 2003 through 2 May 2003 for recovery from a lumbar puncture complication, Aetna reasoned that Helms did not specifically mention severe headaches as a reason for the procedure, rather only "pain." Aetna's analysis concluded that

> Mr. Helms began complaining of severe headaches in February 2003. He worked, full time while taking multiple medications, including a narcotic . . . Dr. Epperson has stated that Mr. Helms experiences sedation from his medication, which is why he cannot work. The medication Mr. Helms was taking at the onset of

disability was reported . . . to be Synthroid, Flomax and Covera. There is no mention of a sedating, narcotic medication. Medication he has been taking while out of work is Methadone and Neurontin. If Mr. Helms was not on this medication regime at the onset of disability in July 2003, and has not worked since this medication was prescribed he cannot adequately be evaluated with respect to restrictions and limitations in the workplace.

Therefore, based on our review . . . the medical information does not contain any objective conditions, which would support a disability of such a severe nature as to preclude him from returning to work.

Id. at 13.

On 18 May 2004 Helms filed a complaint under 29 U.S.C. § 1132. He sought STD benefits, LTD benefits, and also equitable relief. The parties filed a consent to jurisdiction by magistrate judge and filed cross-motions for summary judgment. After briefing and oral arguments, the magistrate judge granted Defendants' motion for summary judgment and denied Helms's motion for summary judgment. Helms timely appealed the magistrate judge's decision.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment in an ERISA case *de novo*, applying the same legal standards that controlled the district court's determination. Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).

14

We apply the following procedure in reviewing denials of benefits under ERISA plans:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he <u>was</u> vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

<u>Id.</u> at 1137-38 (footnotes omitted).

We follow this approach in reviewing both an administrator's interpretation of a plan and its factual determinations. See <u>id.</u> at 1134 n.3. Here, the parties agree that Aetna was vested with discretion and that, therefore, the arbitrary and

15

capricious standard applies here in some form. They disagree, however, as to whether the heightened standard applies.

Helms argues that Aetna is operating under a conflict of interest between its fiduciary role and its profit-making role because, although Aetna does not pay benefits to STD plan participants out of its own assets, Helms asserts that Aetna pays LTD plan participants out of its own assets. Therefore, Helms claims, Aetna has a financial incentive to deny STD claims, thereby reducing the amount of STD claims that eventually become LTD claims. We need not decide that issue today because, as we discuss below, we hold that Aetna's decision to deny STD benefits does not survive even the more deferential arbitrary and capricious standard (as opposed to a heightened arbitrary and capricious standard of review when a conflict of interest is present). See id. at 1138 (stating that "[i]f no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest . . . .").

### III. DISCUSSION

A. STD Benefits Claim

In determining whether Aetna was *de novo* wrong and unreasonable in terminating Helms's STD benefits, we begin with the plan itself, since an ERISA

16

plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D). Under Aetna's plan section labeled "Medical Proof of Disability," Helms was required to provide information from his physician that verified and explained the nature and extent of his disability. Helms argues that he has met Aetna's STD requirements and that not only was Aetna's procedural handling of his STD claim flawed, but that Aetna's substantive reasoning for the denial of his STD claim was faulty. For the following reasons, we agree.

1. Aetna's Procedural Handling of Helms's STD Claim

Aetna never subjected the medical evidence provided by Dr. Epperson to peer review, nor did Aetna ever subject Helms to an independent medical exam ("IME"). We have been critical of a nurse's review when a meaningful review dictated assessment of specialized tests beyond a nurse's training. See Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1326-27 (11th Cir. 2001). Here, while no reviews of specialized tests were necessarily required, the STD benefits hinged on a diagnosis that even Nurse Blackmer admitted was subjective. Aetna was presented with no evidence that suggested that Helms was a malingerer; conversely, the record was replete with numerous office visit notes

17

and narratives from Dr. Epperson expressing worry over Helms's condition and crediting his complaints of debilitating chronic headaches.

In Godfrey v. Bellsouth Telecommunications, Inc., a nurse practitioner never bothered to gather the treating doctor's notes and test results. 89 F.3d 755, 758-59 (11th Cir. 1996). Here, Aetna's notes concluded that Aetna should request the office visit notes from both Drs. Thornbury and Epperson. Similar to the facts in Godfrey, Aetna's records do not reflect that Aetna ever followed through on its notation that it "[was] necessary" to gather all of Dr. Thornbury's office notes and test results. See id.[1]

Given the circumstances, Aetna's reliance on a registered nurse's review of an admittedly subjective diagnosis without so much as a peer review or an IME was wrong and unreasonable. See Godfrey, 89 F.3d at 758-759 (holding that the record supported the district court's finding that defendant's physicians arbitrarily rejected clear medical evidence that plaintiff submitted and ignored the medication that claimant had to take on a daily basis without examining her themselves or seeking the treatment notes of her doctors); see also Kunin v.

---

[1] Admittedly, Dr. Thornbury treated Helms's for his rotator cuff injury, not his headaches. Nevertheless, the record fails to indicate that Aetna followed through on its own suggested course of action laid out in its internal notes. Although not directly related to Helms's headaches, the complete orthopedic records could have indicated whether Dr. Thornbury noted any signs of malingering.

18

Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990) (holding that an ERISA administrator's inadequate investigation and reliance on non-experts in the field failed to provide a reasonable basis for the administrator's determination).[2]  Like our sister circuit, we believe that "[a]lthough in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of the allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this [p]lan" and Helms's case.  See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442-43 (3d Cir. 1997).

Aetna's own procedures set forth two appeals levels Helms needed to exhaust before bringing suit in either state or federal court.  At appeal "Level 1," Aetna's "decision w[ould] be forwarded to [the claimant] in writing and w[ould] include the specific reasons and plan references on which the decision is based." R1, 29-5 at 29.  At appeal "Level 2," Aetna's procedures state that it would notify a claimant of Aetna's decision within 45 days of Aetna's receipt of the request for a Level 2 review.  If Aetna needed additional time, it would notify the claimant "during that 45-day period of why additional time is needed." Id.

---

[2] We are not espousing a rule that qualified nurses can never review claims, but in circumstances such as these, with highly subjective determinations, a peer review or an IME was warranted.

Aetna was wrong in failing to communicate sufficiently its justifications for both the various initial denials Helms received and the extension Aetna granted itself in ultimately denying Helms's Level 2 Appeal. The three identical, initial denial letters lack the required specificity. Aetna's letters from 13 and 30 October 2003 and 19 November 2003 all stated that Aetna "c[ould ]not certify [Helms's] disability because [they] ha[d] not received medical information to show that [Helms] remain[ed] disabled." R1, 29-4 at 7, 10, 15. Internally, however, even before the 13 October 2003 denial, Aetna's reviewer concluded that Helms lacked "enough objective medical information" to support continuing his STD benefits, R1, 29-13 at 3, and that Helms failed to present sufficient (or any) restrictions and limitations.[3] Nowhere in Aetna's first three denial letters did Aetna explain its conclusion regarding objective evidence. Furthermore, Aetna failed to identify any specific examples of objective evidence that Helms could have submitted in support of his STD claim, despite Aetna's own policy that stated that denied claimants would receive "[a] description of additional material or information [they] could provide to support the claim -- and the reasons why

---

[3] Aetna's internal notes vacillated between the conclusion that the restrictions and limitations presented were insufficient and the conclusion that Helms failed to present any restrictions and limitations. Compare R1, 29-13 at 3 (noting "R&Ls MD advises no work due to chronic headaches") with R1, 29-14 at 2 (concluding "[b]ased on no R&Ls, given the fact that [Helms] is able to drive, do machinery, etc. medical continues to not support impairment").

that information [wa]s necessary." R1, 29-5 at 28.[4]  In fact, on Aetna's own APS

form under the question that asks for "Objective findings that substantiate

impairment," Aetna gives examples that include "current laboratory, <u>physical

and/or mental status examination</u>, and other testing."  <u>See, e.g.</u>, R1, 29-6 at 12

(emphasis added).  Not only did Aetna repeatedly neglect to inform Helms that it

required "objective" evidence, but, based on its own forms, Dr. Epperson's

examinations of Helms should have qualified as "objective findings."  Nor do the

three initial denial letters specifically reference a need to provide or clarify

Helms's restrictions and limitations.  Under the plain language of its plan, Aetna

was wrong to send Helms these terse letters.  <u>See</u> <u>Mitchell</u>, 113 F.3d at 442 ("The

Administrator's denial letters are terse, and we are not altogether certain of their

meaning.").  No reasonable interpretation of Aetna's plan documents permitted

---

[4] Given that Aetna has discretion in terms of what it considers adequate "proof" of disability, we cannot say that it is always unreasonable for Aetna to demand objective evidence. <u>Accord</u> <u>Wangenstein v. Equifax, Inc.</u>, 191 Fed. Appx. 905, 913-14 (11th Cir. 2006) (unpublished) ("[G]iven that KNS has discretion in terms of what it considers adequate 'proof' of continuing disability, we cannot say that it is unreasonable for KNS to demand objective evidence.").  We note, however, that this case is distinguishable from <u>Wangenstein</u> on its facts. As an initial matter, the plan administrator in <u>Wangenstein</u> had four doctors conduct five independent paper peer review consultations and a neurologist conduct an IME, neither of which was performed here.  <u>Id.</u> at *2-4.  There, the neurologists recommended specific additional documentation and procedures that would be helpful. <u>Id.</u> at *8. Here, in contrast, Aetna repeatedly gave no indication to Helms as to what it needed, even as it internally noted that it lacked objective evidence and sufficient restrictions and limitations.

Aetna to send boilerplate letters that did not sufficiently disclose Aetna's reasons for the denial of Helms's STD claim.

At appeal "Level 2," Aetna's procedures stated that it would notify claimants of Aetna's decision within 45 days of Aetna's receipt of the request for a Level 2 review. Aetna promised that all extension notices for reviewing disability claims would explain: "- The standards used in determining whether a participant is entitled to a benefit, - The unresolved issues that prevent a decision on the claim, and - The additional information needed to resolve those issues." R1, 29-5 at 28. With regard to Level 2 appeals specifically, Aetna claimed that if it needed additional time, it would notify the claimant "during that 45-day period of why additional time is needed." Id. at 29. Aetna's letter notifying Helms that Aetna was extending the appeal deadline failed to give any reason as to why the additional time was needed to reach a conclusion. No reasonable interpretation of the plan allows Aetna simply to ignore the substance of its own notification requirement.

2. Aetna's Analysis of Helms's STD Claim

In addition to asserting that Aetna's claims procedures were inadequate, Helms also argues that Aetna's substantive analysis of his STD claim was flawed. We agree. In reviewing the record as a whole and taking the evidence in the light

22

most favorable to Aetna, we find no sufficiently contradictory evidence from Dr. Epperson regarding Helms's impairment. Aetna and the dissent try to paint Dr. Epperson's opinions as inconsistent, but we find that the portions of the medical evidence that cast Helms as improving are qualified by the undisputed fact that his improvement was dependent on medication that left him sedated and interfered with his daily functions. It is true that Dr. Epperson recorded an improvement in Helms's headaches in his office visit notes of 3 September 2003, but Dr. Epperson's notes from that day also recommended that Helms continue his medications and suggested that he could decrease his medication dosage at his own discretion.[5] Dr. Epperson's later APS, and his letters of 14 October 2003 and 25 November 2003, further clarified and contextualized his office visit note from 3 September 2003. Stated simply, Helms's condition "improved" only through medication that controlled the severity of the headaches but left Helms sedated and interfered with his ability to work and drive. R1, 29-7 at 19. At no point did Dr. Epperson vacillate regarding his ultimate conclusion that Helms qualified for disability benefits. Aetna essentially pulled two positive sentences out of Dr. Epperson's 3 September 2003 notes and discredited or ignored the

---

[5] Aetna's records reflect that Helms notified Aetna that he had not, in fact, reduced his medication after the 3 September 2003 visit with Dr. Epperson.

23

undisputed evidence consisting of the neurologists' numerous office visit notes, APSs, and narratives that stated that Helms's condition did not continue to improve unless on sedating medication and that Helms was unable to work in his condition. A doctor's treatment records will often note improving and deteriorating conditions, especially in situations such as these, wherein a doctor has tried different combinations of medicines with various results. Under the dissent's logic, any noted improvement, however excised from the context of the unrefuted medical conclusion that Helms warranted disability, must result in a triable question of fact. Viewing the evidence in the light most favorable to Aetna still leaves Aetna unable to refute the fact that Helms's improved status at the time was a result of a regiment of drugs that left him sedated and, in the opinion of the only doctor involved in Helms's review, unable to work. If Aetna believed that there was a contradiction in the Dr. Epperson's notes, it could have had conducted a peer review of Helms's file and it could have ordered an IME to gain additional perspective, especially since Nurse Blackmer herself admitted that "[m]igraine is a subjective diagnosis." R2, 44-2 at 85.[6]

---

[6] Furthermore, Aetna's argument on appeal that Dr. Epperson merely stated that Helms's medication could "cause mild sedation" but did not claim that the medication actually caused Helms sedation is not only *post hoc* reasoning, but also wrong. See R1, 29-7 at 26. Dr. Epperson noted in a 25 November 2003 letter submitted with Helms's appeal that the medications "cause[d] sedation interfering with his ability to work or drive a vehicle and numerous other daily activities." R1, 29-7 at 19. Even Aetna's own notes acknowledge that

To conclude, as Aetna did, that Helms provided insufficient restrictions or limitations, or even no restrictions and limitations at all, is wrong because it is contrary to the undisputed evidence. In light of its own forms, Aetna unreasonably construed what qualified as "restrictions and limitations." While Aetna was not satisfied with Dr. Epperson's restrictions and limitations, Aetna's APS form only gives pithy examples of restrictions and limitations, suggesting: "Activities of Daily Living, Driving, Lifting, Pulling, Pushing, and Amounts, etc." R1, 29-6 at 12. Dr. Epperson stated that Helms had difficulty driving and working. Aetna's 18 August 2003 notes confirmed that Helms had restrictions regarding driving and working with machinery. R1, 29-12 at 2; 29-13 at 2. Also, Helms presented evidence, such as his questionnaire, wherein Helms indicated that he had trouble driving, among other things, and frequently needed to lay down and rest throughout the day.[7] Aetna's appeal denial letter admitted that

"[m]eds leave him in a sedated state, can't drive, and has trouble focusing/concentrating." R1, 29-13 at 2.

[7] The dissent asserts that the fact that Helms performed his work throughout the period of treatment is evidence that allows a reasonable inference that Helms's headaches did not render him disabled. We have considered similar arguments in prior cases and noted doubt that an applicant's status as a full-time employee constitutes evidence that he was able to perform the material duties of his occupation on a full-time basis. Levinson, 245 F.3d at 1327 n.6 ("[Applicant] 'gave it a go' and her attempt to work does not forever bar her collection of sickness disability benefits.'" (citing Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702, 706 (11th Cir. 1995)).

Helms's questionnaire "provide[d] insight [into] the activities of Mr. Helms may be able to do or not do within the course of the day." R1, 29-7 at 12. In the very next line, however, Aetna then concluded that the questionnaire "d[id] not inquire about restrictions and limitations" that prevented Helms from returning to work. Id. It is baffling how Aetna could concede that Helms had difficulty driving and needed to lay down occasionally and then go on to conclude in the very next line that Helms failed to submit any restrictions and limitations.

Aetna's reliance on Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965 (2003), is unconvincing. Nord instructs us that we may not impose on plan administrators "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," 538 U.S. at 834, 123 S. Ct. at 1972, but here there was no evidence other than that of Helms's treating physician Dr. Epperson and Helms himself. Put another way, this is not a case wherein the plan administrator refused to credit the opinions of doctors that supported disability but instead accorded greater weight to conflicting opinions of doctors that did not support disability. See, e.g., Wangenstein, 191 Fed. Appx. at 912-13 (upholding a plan administrator's weighing of multiple neurologists' examinations and reviews but ultimately crediting neurologists that did not support a finding of disability). With only Dr.

26

Epperson's medical evaluation in the form of his office notes, test results, APSs, and narratives, Aetna excised narrow snippets of Dr. Epperson's notes, while it discredited or ignored whole tracts of his medical evaluation that supported Helms's STD claim, all without a peer review or an IME. Aetna's review in this case was malignant at worst, and arbitrary at best. See Nord, 538 U.S. at 834, 123 S. Ct. at 1972 ("plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

Here, Aetna possessed only a scintilla of evidence pulled out of context against the extensive documentation of Helms's chronic headaches and powerful medication. While Aetna seized a line in Dr. Epperson's September 2003 records that noted Helms's condition greatly improved, that evidence alone does not create a triable issue of fact when it is undisputed that the remark was written in the context of the drugs Helms continued to take--drugs that left him mildly sedated and interfered with numerous daily activities.[8] In a letter dated October 2003, Dr. Epperson clarified that while Helms's condition had improved, it was still his opinion that Helms warranted disability benefits as a result of his

---

[8] The dissent's suggestion that "[t]hings changed only after Helms underwent surgery to repair a torn rotator cuff on July 8" is simply a mischaracterization of the record. Helms had sought treatment for headaches since February 2003 and in May 2003 Dr. Epperson wrote, with regard to Helms's headaches: "Consider short-term disability and he may need long-term disability." R1, 29-6 at 24.

decreased functionality due to present medications and lingering headaches.[9]  If

Aetna was dissatisfied with the evidence of disability and restrictions and

limitations submitted by Helms and Dr. Epperson, it was entitled to require Helms

undergo an IME or to submit Helms's file to a peer review.  Had Aetna done so,

Aetna would have been entitled to discount Dr. Epperson's opinion in favor of a

contrary opinion produced by an IME or a peer review.  See House v. Paul

Revere Life Ins. Co., 241 F.3d 1045, 1048 (8th Cir. 2001) ("If Paul Revere was

dissatisfied with the medical evidence submitted by Nolewajka, it was entitled to

require House to submit to an [IME].  Had it done so, Paul Revere would have

been entitled to discount Nolewajka's opinion entirely in favor of a contrary

opinion produced by the independent examiner.").

   We find it is unreasonable, and therefore arbitrary and capricious, for Aetna

to have repeatedly sheathed its true justifications in boilerplate language in its

first three denial letters to Helms.  Aetna was also unreasonable to have ignored

submitted restrictions and limitations and excised only snippets of Dr. Epperson's

evaluations without the context of the sedating medications in discrediting or

---

[9] Furthermore, any intimation by Aetna or the dissent that Dr. Epperson somehow improperly "promise[d]" that he would support Helms in violation of his ethical duties as a physician is completely unsupported in the record.  See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (holding that the party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation").

28

ignoring overwhelming portions of Dr. Epperson's medical evidence that supported Helms's STD claim. Finally, Aetna was unreasonable when it failed to initiate a peer review or an IME that could have provided additional perspective on this admittedly subjective diagnosis. To be clear, we are not holding that Aetna must always have a doctor perform a claims review or even that a failure to perform an IME is necessarily arbitrary and capricious. Rather, we find that, in this case, Aetna's myopic and flawed reasoning and its procedural failures to properly inform Helms of the specific reasons for his denial in a timely fashion, coupled with the lack of an IME of an admittedly subjective condition, is arbitrary and capricious. Similar to the conclusion reached by the district court in Levinson, "there was absolutely no justification for [Aetna's] denial of [Helms's] benefits claim. [Aetna] did not have a doctor review [Helms's] condition and presented no evidence to [support] its findings that [Helms] was not entitled to benefits. In essence, there was no disputed material issue of fact in [Aetna's] determination, which is why summary judgment [for Helms is] appropriate." See Levinson v. Reliance Standard Life Ins. Co., 2000 WL 193623, at *5 (S.D. Fla. Jan. 5, 2000) (unpublished), affirmed, 245 F.3d at 1331.[10]

---

[10] The dissent cites non-binding caselaw that suggests a remand to the plan administrator may be the appropriate course of action. We disagree. As the majority in Levinson held, we too find that "[Aetna] had more than adequate opportunities to establish an administrative record

29

B. <u>Long Term Disability Benefits Claim</u>

We agree with the magistrate judge that nothing in either the STD or LTD plans required Helms to exhaust his STD benefits before being eligible for LTD benefits. Since Helms never applied for LTD benefits, he has failed to exhaust his administrative remedies regarding his claim for LTD. <u>See</u> <u>Perrino v. S. Bell Tel. & Tel. Co.</u>, 209 F.3d 1309, 1315 (11th Cir. 2000). We note, however, that the magistrate judge's dismissal should have been *without prejudice*. <u>See</u> <u>Ravencraft v. UNUM Life Ins. Co. of Am.</u>, 212 F.3d 341, 344 (6th Cir. 2000) (vacating summary judgment to defendant UNUM and remanding with instructions to dismiss without prejudice); <u>see also</u> <u>Bickley v. Caremark Rx, Inc.</u>, 461 F.3d 1325, 1330 (11th Cir. 2006) (affirming the district court's dismissal of beneficiary's complaint without prejudice). As a result, we vacate and remand this case to the district court to dismiss the asserted cause of action without prejudice.

C. <u>Equitable Relief Claim</u>

Helms has stated a cause of action and has an appropriate remedy under § 502(a)(1)(B). As a result, we affirm the magistrate judge's dismissal of Helms's

---

containing evidence contradicting [Helms's] evidence pointing to disability . . . . [Aetna] did not do this." <u>See</u> 245 F.3d at 1328.

claim for ERISA § 502(a)(3) equitable relief.  See Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1072-73 (11th Cir. 2004) ("[A]n ERISA plaintiff with an 'adequate remedy' under Section 502(a)(1)(B) could not alternatively plead and proceed under Section 502(a)(3).").

## III. CONCLUSION

Aetna's procedural handling of Helms's STD claim was faulty and its substantive reasoning both wrong and unreasonable.  Accordingly, we conclude that Aetna was arbitrary and capricious in terminating Helms's short-term disability benefits.  We **REVERSE** the decision of the district court magistrate judge with respect to Helms's short-term disability benefits determination, **REVERSE** the district court magistrate judge with respect to Helm's long-term disability benefits claim on the basis that the dismissal should have been without prejudice and **AFFIRM** the district court magistrate judge with respect to Helms's claim for equitable relief, and hereby **REMAND** to the district court magistrate judge with instructions to enter a final judgment consistent with this opinion and determine the amount of damages.

PRYOR, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Helms failed to exhaust his claim for long-term disability benefits and that Helms failed to state a claim for equitable relief, but I respectfully dissent from the majority's decision to reverse the grant of summary judgment on Helms's claim for short-term disability benefits.

For Helms to be entitled to summary judgment on his claim for short-term disability benefits, we must conclude that Helms's evidence proves, with all reasonable inferences drawn in favor of Aetna, that Helms is "continuously unable to perform the essential duties of [his] regular occupation in substantially the same manner as [he] did just before incurring a medically determined physical or mental impairment . . . with any adjustments that the Company makes to those responsibilities." Definition of Disability, 2003 STD Plan at 2. "If the movant bears the burden of proof," as Helms does here, he "must establish that there is no genuine issue of material fact as to any element [of his claim]." In'l Stamp Art, Inc. v. U.S. Postal Serv., 456 F.3d 1270, 1274 (11th Cir. 2006). This burden is compounded when we apply a deferential arbitrary and capricious standard of review to the determination of the plan administrator. Helms has not satisfied this burden.

Consider the following time line. On February 27, 2003, Helms saw Dr. Epperson and complained of daily headaches "for the past several months." Dr. Epperson ordered several tests, prescribed Neurontin, Hydrocodone, and Topomax, and told Helms to return in a few weeks. Dr. Epperson noted that Helms was "alert and oriented" with a "normal attention span and concentration." In April, Dr. Epperson expressed his concern for Helms but noted that "[Helms] does not appear ill presently." Dr. Epperson did not suggest that Helms was disabled, and Helms did not suggest that he could not work because of his headaches. On May 8, 2003, Dr. Epperson noted that Helms's headaches were "somewhat improved" but that he "has difficulty doing his job at work" because Topomax made him drowsy. Again, no one said Helms was disabled. On June 2, Dr. Epperson noted that Helms's headaches were "much improved" and that he felt better after stopping Topomax. Dr. Epperson scheduled the next appointment for three or four months instead of three or four weeks. Throughout this period of treatment, Helms performed his work and did not allege that he was disabled by his headaches. All of this evidence allows a reasonable inference that Helms's headaches did not render him disabled.

Things changed only after Helms underwent surgery to repair a torn rotator cuff on July 8. Although the majority suggests that this statement is a

33

"mischaracterization of the record," I disagree. Following that shoulder surgery, Helms sought and obtained disability benefits, but those benefits were unrelated to his migraine headaches. Only after Helms left work and received these short-term benefits did he suggest to Dr. Epperson that his headaches made working impossible and only then did Dr. Epperson begin to assert confidently that Helms was "completely unable to work." Not only did things change, but the change was largely unexplained.

While Helms was on disability leave for the repair of his torn rotator cuff, Dr. Epperson filed a physician statement, based on an otherwise unrecorded August 15 office visit, that noted Helms could perform sedentary work but left blank the space to describe a patient's restrictions and limitations. On September 3, Helms returned to Dr. Epperson. Dr. Epperson noted that Helms was "doing remarkably well with no further headaches" and could decrease his medication until he was completely off Neurontin. Dr. Epperson also noted that Helms "is retired and trying to get Disability" and "I totally support him in his endeavor to retire." To make good on his promise of "total[] support," Dr. Epperson sent several letters to Aetna. First, on September 11, he submitted a new physician statement that inexplicably contradicted his earlier statement that Helms could perform sedentary work and stated instead, without explanation, that Helms was

34

completely "unable to work." This statement was also inconsistent with Dr. Epperson's notes about the visit on September 3, which described Helms as "doing remarkably well with no further headaches" and "much improved on present regimen." Second, after Helms's claim was denied, Dr. Epperson sent another statement and a letter that reasserted that Helms was "unable to work" because of his headaches. Dr. Epperson sent this statement without any intervening office visit. On November 25, Dr. Epperson finally saw Helms again and, that same day, sent another letter to Aetna asserting, in conclusory terms, that Helms was totally unable to work because his headache medication left him sedated. Notwithstanding the suggestion of the majority, I cannot say that this evidence supports a reasonable inference that Dr. Epperson "violat[ed] . . . his ethical duties as a physician." I can say that this record allows a reasonable inference that Dr. Epperson reached his opinion that Helms was completely "unable to work" because he had promised to support Helms's desire to retire, not because Helms's condition had worsened.

Helms offers nothing more to support his application. Helms wrote on a form that, while he could perform household chores, he had difficulty driving and concentrating. Helms never explained why he could not perform his work if given reasonable accommodations. Helms also never offered evidence of any

change in his medical condition following the September 3 visit when Dr. Epperson described him as "doing remarkably well with no further headaches." Although the majority notes that Helms asserted that his medication "mildly sedated" him, Dr. Epperson only asserted "sedation" as a basis for disability after first asserting no basis for disability and then asserting pain from headaches as a basis for disability. At no time did Helms provide enough evidence to support a conclusion that he was disabled under the terms of the plan.

Although Dr. Epperson's diagnosis of chronic headaches is unrebutted, his assertion that Helms is "disabled" is a legal opinion, not a medical one. Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1285 (11th Cir. 2003) ("[T]he question of whether [a claimant] is 'totally disabled' is a mixed one, involving issues of both plan interpretation and fact."). Because Dr. Epperson never identified what Helms could and could not do, the record does not contain the evidence necessary to conclude that Helms could not do his job. In fact, the record contains ample evidence, such as Dr. Epperson's notes, his first physician's statement, and Helms's ability to work through his headaches and Topomax, that compels the opposite conclusion.

This appeal is absolutely not like Levinson. In that case, a doctor gave a diagnosis of a debilitating heart illness, supported his diagnosis with

36

echocardiograms and other evidence, and explained how the diagnosis rendered Levinson unable to function at work. A nurse disagreed with the doctor's diagnosis of a heart condition and determined that the claimant was asymptomatic based on his own reading of the echocardiograms. We held that the insurance company could not credit the nurse, who had no expertise in this field and lacked the training to evaluate the medical evidence, against the doctor's diagnosis. We explained that the insurance company should have had another doctor examine the claimant if the company wanted to dispute the medical diagnosis. After the nurse's diagnosis was disregarded, only the doctor's diagnosis remained and summary judgment was appropriate for the claimant. In contrast with Levinson, Helms offered a doctor's opinions and notes that are internally inconsistent, conclusory, and do not require the legal conclusion that Helms is disabled. Any layperson (a nurse, a claims administrator, a federal judge, or reasonable juror) could find them insufficient to prove that Helms meets the plan's definition of disability.

In short, this appeal is not a case of Aetna "rebutting" Helms's expert evidence with a nurse's opinion, but of Aetna concluding that Helms's evidence did not prove his claim of disability. All we need to do is read the file. After all,

Helms actually performed the duties of his job during the period that he suffered from the worst headaches and while he was drowsy from Topomax.

Because I can arrive at this conclusion without any medical expertise, it is difficult for me to understand how the majority's criticism of "a nurse's review" is different from "a rule that qualified nurses can never review claims" or a rule that an IME is always required. Perhaps, the majority's rule is that a qualified nurse may review a claim but can never deny it? The problem for Helms, as I see it, is not that he failed to provide objective evidence of his medical condition but that the objective evidence he provided—doctor's notes, doctor's opinions, medication dosages, work history, etc.—was internally inconsistent, conclusory, and tended to undermine his claim.

If Aetna "sheathed its true justification [for the denial] in boilerplate language" as the majority suggests, then the majority is rightly concerned about its handling of Helms's case. Still, "[a] decision to deny benefits is arbitrary and capricious [only] if no reasonable basis exists for the decision." Shannon v. Jack Eckerd Corp., 113 F.3d 208, 210 (11th Cir. 1997). Once sued, an administrator is not limited to the reason for denial that it gave the applicant but may argue any reasonable basis for its decision based on the record before it. "We cannot over emphasize the importance of the discretion afforded a claims administrator; the

underlying premise of arbitrary and capricious, rather than <u>de novo</u>, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan." <u>HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co</u>., 240 F.3d 982, 994 (11th Cir. 2001).

If all Helms wanted from Aetna was a reasoned explanation for its denial of benefits or for Aetna to order an IME, then Helms could ask us to order the district court to remand this claim to Aetna. <u>See</u>, <u>e.g</u>, <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1074 (2d Cir. 1995) (ordering the district court to remand to the administrator because the "present record is incomplete and we therefore cannot conclude that there is no possible evidence that could support a denial of benefits"); <u>Rakoczy v. Travelers Ins. Co.</u>, 914 F. Supp. 166 (E.D. Mich. 1996) (remanding to administrator "because it failed to adequately state the reasons for denial or describe additional materials that plaintiff could adduce to perfect her claim"). ERISA charges the administrative fiduciary and not the federal courts with providing an initial "full and fair review" of benefit claims, 29 U.S.C § 1133; "[t]he remedy when [an ERISA administrator] fails to make adequate findings or to explain its grounds adequately is to send the case back [to the administrator] for further findings or explanation." <u>Gallo v. Amoco Corp</u>., 102 F.3d 918 (7th Cir. 1996). The remedy is not to change the summary judgment

39

standard in Helms's favor and place the burden on Aetna to disprove Helms's claim to benefits. "[T]hat the plan administrator failed to provide the adequate procedures does not mean that the claimant is automatically entitled to benefits [because] such a holding might provide the claimant 'with an economic windfall should she be determined not disabled upon a proper reconsideration.'" Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 776 (7th Cir. 2003).

I find nothing in either ERISA or this plan that would require Aetna to order another doctor to examine Helms before denying benefits. The plan affirmatively places the burden on Helms to provide Aetna information that "verifies . . . and explains the nature and extent of [his] disability." Although Aetna could have given Helms a better explanation for the denial of his application for benefits, Aetna should not be criticized for having a medical professional—a nurse—review Helms's medical records. Indeed, a claims administrator with no medical training could have determined that Helms's medical records did not "verify" or "explain" his disability, but actually cast doubt on it. Like the magistrate judge, I think even a federal judge should be able to see that.